UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONICA NICOLAYSEN DOWHAN, ERIK ELIASON
ANDREW KRESS, MATHEWS V. JOHN, individually
and on behalf of similarly situated LL5/LL6
employees,                                            **CLASS ACTION**

     Plaintiffs,                                Case No.
vs.                                                   Hon.

FORD MOTOR COMPANY,
a Delaware Corporation,

     Defendant.

---

Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Pitt, McGehee, Palmer and Rivers PC
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com

Kevin M. Carlson (P67704)
Kevin M. Carlson PLLC
Attorney for Plaintiffs
P.O. Box 6028
Plymouth, MI 48170
(734)386-1919 (phone/fax)
kevin@kevincarlsonlaw.com

---

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND
MONEY DAMAGES AND JURY DEMAND**

Plaintiffs, individually and on behalf of a class of others similarly situated, bring these wrongful termination claims against Ford Motor Company ("Ford" or "Company") for the following reasons:

## Introduction

1.     Our national employment retirement law, the Employee Retirement Income Security Act, ("ERISA") protects employees who, through their employment, participate in retirement income and health and welfare benefit plans. Because employers control the employees' ability to earn retirement benefits through continued employment, Congress made it unlawful for an employer to make adverse employment decisions motivated by an intention to deprive employees of retirement benefits for which they would become eligible through continued employment.

2.     Congress embedded this policy into Section 510 of ERISA, which makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan]." 29 U.S.C. § 1140.

3.     In order to reduce operating expenses and reduce debt and pension liabilities, Ford adopted a Salaried Involuntary Reduction Process ("SIRP") which was carried out in Four Waves.

4.     Ford retained the services of Boston Consulting Group ("BCG") to develop a headcount and pension reduction plan.  This plan was promoted as a High-Tech program designed to modernize Ford and was given the title of "Smart Re Design." At the core of the BCG program was a proprietary algorithm that was capable of quickly reviewing information from tens of thousands of personnel records. This automated system was deliberately programmed to target older and higher pension-cost salaried employees based on legally protected characteristics including the employee's proximity to retirement benefit milestones or the employee's age.

5.     Plaintiffs and the other LL5/LL6 managers they seek to represent were separated in Wave Four of the SIRP on May 31, 2019.

6.     Plaintiffs are all former long-term managers of Ford who were selected for separation in Wave Four for the purpose of preventing them from reaching important milestones which would have allowed them to receive their full retirement benefits and would have dramatically increased Ford's financial obligations to their former managers.

3

7.      Managers such as Plaintiffs, hired before January 1, 2004, were eligible to participate in Ford's General Retirement Plan ("GRP").  Milestones for full retirement benefits per the terms of the GRP included a supplemental benefit upon attaining 30 years of Ford Service, regardless of age ("Service Milestone" of "30 and out") or attaining the age of 55 and at least 10 years of Ford Service, thus entitling the employee to an early retirement benefit ("Age Milestone" or "55 and 10").

8.      Ford, with the aid of the BCG algorithm, terminated Plaintiffs based on their age, for the purpose of preventing them from attaining their "30 and Out" supplemental benefit and "55 and 10" early retirement benefit, or both.

9.      By terminating its managers to prevent them from attaining one or both Milestones, Ford significantly reduced the employee's lifetime retirement benefits and significantly improved its balance sheet by reducing its ongoing pension obligations.

10.     The impact on Ford's long-term managers terminated short of their Age and Service Milestones has been financially devasting.  In one case presented here, a 52-year-old LL5 manager was terminated with 29.2 years of service, causing her lump sum pension to be set at $552,595 instead of $1,144,019, which she would have received as her full lifetime pension if she been allowed to work until March 31, 2020, thereby attaining her "30 and Out" and a 55  and 10" Milestone.  Ford saved approximately $591,424 by unlawfully terminating this manager a few months short of her Service Milestone.

11.      If this 52-year-old Ford manager had been allowed to work to her normal retirement age of 65, the lump sum value of her GRP pension would have been $2,100,000.00.

12.     Managers who were notified of their impending terminations and were close to reaching either a Service or Age Milestone requested Ford "Bridge" them to one or both Milestones. Bridging could be accomplished in several ways.  One form of Bridging is to delay the employee's termination date until they reach either the Service or Age Milestone. Another form of Bridging is for the Company to add to the employees age or years of service so that the employee could achieve an important retirement milestone. The opportunity for an employee covered by ERISA to be Bridged is a retirement benefit set forth in a Ford ERISA plan and is protected by ERISA.

5

13.     Qualified LL5 Managers who were terminated in Wave Four were entitled to Bridging pursuant to Ford's Select Retirement Plan ("SRP"). Each of them would have received an appropriate Bridge to full retirement benefits if Senior management had informed them of this entitlement.  Instead of being honest and forthright about this Bridging entitlement, however, Ford's Senior management breached their moral, ethical and legal duties to the Company's former LL5 managers by denying requests for Bridging and concealing from this set of managers their rights under the SRP.

14.     The SRP permitted the adding of three years of age to a LL5 managers who were age 52 or older, and three years of service credits for LL5 managers with 10 or more years of service, thus enabling the employee to qualify for a "55 and 10" early retirement.  SRP Bridging is known within the Company as a "3+3 Bridge".

15.     Ford granted some employees an opportunity to Bridge and denied Bridging to other similarly situated employees, including Plaintiffs.

16.     ERISA prohibits an employer from arbitrarily granting or denying similarly situated eligible employees a retirement benefit, which in this case includes the Bridging rights set forth in the SRP, an ERISA Plan.

17.     Age was an additional motivating reason for Plaintiffs' terminations. Ford selected for termination older managers who had not yet reached the Age Milestone.

6

18.    In addition to the BCG algorithm, Ford used a forced ranking performance evaluation process which was and remains biased against its older managers.

19.    Specifically, the SIRP process required the selection of employees for termination based in part on performance and projected or potential future performance. The SIRP selections were thus tainted because Ford used biased algorithm and performance evaluation tools which were infected with age bias.

20.    This systemic and automated form of age bias has made Plaintiffs more vulnerable for separation.

21.    Ford has refused to allow those managers terminated in Wave Four from transferring laterally to open positions and it has refused to permit the targeted managers from taking a lower status position.

22.    By contrast, Ford did not select for termination employees who were substantially younger than Plaintiffs, and further is promoting younger managers into positions to replace Plaintiffs upon separation.

23.    Ford continues to advertise for new employees to be hired into slots that could easily be handled by the targeted managers.  Ford refuses to accept the applications of the terminated Wave 1 through 4 managers.

24.     Plaintiffs bring this lawsuit to secure for themselves damages and appropriate equitable relief resulting from their wrongful terminations and seek Class Wide equitable relief on behalf of similarly situated former Ford managers who have not executed a release of claims.

25.     Class Representatives request the Court order Ford to provide those employees covered by ERISA equal opportunity to secure a retirement benefit, including Bridging.

## PARTIES, JURISDICTION AND VENUE

26.     Monica Nicolaysen Dowhan ("Dowhan") is a resident of Grosse Ile, Michigan.

27.     Mathews V. John ("John") is a resident of Canton, Michigan.

28.     Andrew Kress ("Kress") is a resident of Ferndale, Michigan.

29.     Erik Eliason ("Eliason") is a resident of Northville, Michigan.

30.     Ford is a Delaware Corporation headquartered in Dearborn, Michigan.

31.     All the events in controversy occurred in this Judicial District.

32.     The Court has federal question subject matter jurisdiction over Plaintiffs' Section 510 ERISA claims.

33.    The Court has supplemental jurisdiction over Plaintiffs employment discrimination claims under the Michigan Elliott-Larsen Civil Rights Act ("ELCRA") MCL 37.210 *et seq.* because such claims arise out of the same set of facts as Plaintiffs' federal claims such that they form part of the same case or controversy.

34.    Venue is proper in the Eastern District of Michigan because the actions giving rise to this case occurred in Wayne County, Michigan and Ford is a corporation doing business in this judicial district.

35.    Plaintiffs are participants in the Ford GRP, which is an ERISA plan as that term is defined in ERISA.

36.    The Ford GRP is an ERISA Plan subject to §510 of the Employee Retirement Income Security Act ("ERISA").  29 U.S.C. §1140.

37.     Exhaustion of administrative remedies under the GRP is not required as a pre-condition to filing this action because none are available to resolve any of the issues raised in this complaint and, if any such remedies were available, pursuing them would be futile.

## STATEMENT OF FACTS

**A.    Description of Ford's General Retirement Plan**

38.    Ford's General Retirement Plan ("GRP") was formed in 1950.

39.    The GRP is a traditional, defined benefit pension plan that pays fixed monthly or lump sum retirement pension amounts to eligible Ford employees.

40.    The GRP provides a variety of pension benefits, including regular and early retirement pensions and certain supplemental pension allowances.

41.    But for the termination of their employment, Plaintiffs would have become eligible for the following benefits under the GRP: (1) "55 and 10" early retirement, under which they could obtain a full retirement at age 55 with ten years of service; and (2) the "30 and Out" pension supplement, under which employees with at least 30 years of credited service who take early retirement are eligible for an additional monthly pension payment until the age of 62.

42.    As of December 31, 2017, the GRP had assets of $19,697,120,747, active/eligible participants totaling 16,381, retired or separated participants receiving benefits totaling 32,850 and retired or separated participants eligible to receive future benefits totaling 14,642.

43.    Since the early part of the 2000s, Ford has taken steps to remove from its balance sheet pension obligations that the Company, along with consultants and investors, viewed as debts weighing down its credit rating and stock price.

44.    Since the early 2000s, the Company's pension obligations to current and future retires exceed the assets of the GRP.

45.    In 2012, Ford's global pension funds were underfunded by $19 billion.

46.    In 2003, Ford announced that beginning January 1, 2004, the GRP would be closed to new hires and rehires.

47.    In 2012, the Company, to further reduce its pension obligations (also known as "de-risking" its obligations) amended the GRP to provide that retiring participants would now have the option to secure a lump sum payment in lieu of the annuity which provided lifetime monthly benefits to the retiree and his surviving spouse.

48.    Thus, under the amended GRP, managers hired before January 1, 2004 with 30 years of Company service were eligible to retire and receive an unreduced lifetime monthly benefit with spousal survivor option, or they could elect to take a lump sum payout at retirement.

49.    As a result of this de-risking program, Ford was able to reduce its underfunded pension obligations from $19 billion in 2012 to $9.8 billion on December 31, 2014.

50.    Beginning in 2012, Ford promoted the lump sum payout option because that was a way for Ford to effectively de-risk its pension obligations by shifting the risk of an underfunded pension from the Company to the employee.

51.     On June 9, 1994, the Company established a Select Retirement Plan ("SRP") for the purpose of providing voluntary retirement incentives to selected Company employees on U.S. payroll who are assigned to Leadership Levels One through Five, or the equivalents of such Leadership Levels, constituting a select group of management or highly compensated employees. The SRP was restated and amended on January 1, 2018.

**B.     GRP and SRP Eligibility Requirements for Full Pension and Health Insurance**

52.     Under the GRP, Managers such as Plaintiffs, hired before January 1, 2004 and who retire at age 55 years old or greater with 10 years or more years of service are eligible for an unreduced monthly benefit with spousal survivor options or may elect to take a lump sum payout.

53.     Managers and who have 10 years or more of Company service but less than 30 years Company service or who are under age 55 with less than 30 years of service will receive a substantially reduced pension.

54.     Retiree Health Care insurance is available to Company employees hired before June 1, 2001 and eligible to retire under the GRP at age 55 or greater with 10 years or more of service or at any age with 30 or more years of Ford Service.

55.     For LL5 and above managers hired before January 1, 2004 the SRP permitted Ford to add three years of service and three years of age in order to increase the likelihood of qualification for a full GRP Pension and Health Insurance or qualify for a full GRP Pension and Health Insurance, or other SRP benefits.

**C.    Description of the Ford 2019 SIRP Terminations and the Senior Management Use of a Biased Algorithm Which Targeted Employees Based on Age and Proximity to Retirement Milestones**

56.     In 2017, the Company determined that over the next two years it would reduce operations costs and pension liabilities by $25.5 billion.

57.     Beginning in 2017, the Company cut 7,000 salaried positions globally including salaried employees who took the buyouts offered in the last year, voluntary separations, and the elimination of some positions that were open but not filled. Approximately 20% of the 7,000 eliminated positions would be senior-level managers.

58.     By 2019, the Company still had $11 billion to cut. To accomplish this cut, Ford engaged in "Waves" of involuntary terminations. By May of 2019, Ford had gone through three Waves reducing hundreds of salaried employees in the United States.

59.     Ford retained the services of Boston Consulting Group ("BCG") to develop a headcount and pension reduction plan.  This plan was promoted as a High-Tech program designed to modernize Ford and was given the title of "Smart Re Design."

60.     At the core of the BCG program was a proprietary algorithm that was capable of quickly reviewing information from tens of thousands of personnel records. This automated review system could target certain salaried employees based on characteristics such as age, years of service, date of hire, salary, performance or potential performance ratings, and other data points. Because the process was automated, BCG Project Managers could quickly perform hundreds of trial runs to assist Ford management in achieving its headcount reduction and pension liability goals.

61.     This automated system was deliberately programed to target older and higher pension-cost salaried employees based on legally protected characteristics including the employee's proximity to retirement benefit milestones and the employee's age. By removing the headcount reduction decision-making from normal channels (i.e. asking an employee's supervisor or Human Resources to decide on the fate of the employee) and delegating the decision making authority to a computer, Ford was assured by BCG that with a little "sprinkle" the illegal computer controlled selection process could be made to appear to be legitimate.

14

62.    Ford was instructed by BCG Project Managers to "sprinkle" among the high pension cost employees, personnel who did not possess the high pension cost characteristics of those selected, in order to mask the discriminatory impact of the selection process.

63.    On May 21, 2019, the Company implemented the Fourth and Final Wave of involuntary terminations (Salaried Involuntary Reduction Process or SIRP), which will result in approximately 800 involuntary terminations of salaried U.S. employees.

64.    In order to reach its financial cost cutting objectives, the Highest Level of Ford Senior Management  directly or indirectly informed those in charge of carrying out the 2019 SIRP to target managers who were hired before January 1, 2004, thus preventing them from reaching critical GRP pension so that Ford would be obligated to pay these severed mangers a fraction of what they would receive if permitted to reach the Age or Service Milestones.

65.    It is anticipated that there will be testimony from high ranking Ford executives that Senior Management was explicit in their instruction to target for SIRP separations managers who were  hired before January 1, 2004 so that Ford's pension obligations would be reduced or completely de-risked by the separated manager taking a fraction of his or her full pension as lump sum payment upon retirement.

15

66.    Ford concealed from Plaintiffs Dowhan, Eliason and Kress, LL5 employees, their eligibility for a 3+3 Bridge through the SRP

**D.    Ford Utilized Forced Ranking and Evaluation Tools Tainted by Age Bias in Order to Select Older Managers to be Targeted for Termination as part of the Wave Four 2019 SIRP**

67.    Senior Management instructed those responsible for selecting employees for the 2019 SIRP terminations to utilize the Company's 25 Panel Evaluation Tool and Forced Ranking outcomes to select managers who were placed in the lower portion of the forced ranking list of evaluated managers.

68.    For decades, Ford has utilized a forced-ranking employee evaluation procedure that compares individual employees or groups of employees to one another using a pre-specified performance distribution ranking system.

69.    Ford has utilized its forced-ranking procedure for purposes of awarding merit increases and bonuses.

70.    Since the late 1990s, Forced Ranking performance evaluation systems required evaluators to rank employees from best to worst and based on that ranking, benefits of employment are allocated.

71.    Ford's practice of using a Forced Ranking technique has been found to be biased against its older employees in that older employees are disproportionately ranked lower while younger employees are disproportionately ranked higher.

72.     The 2019 SIRP termination decisions were not made by Plaintiffs' immediate superiors.

73.     Instead, the termination decisions were made by persons other than their direct supervisors.

74.     Ford also evaluated managers pursuant to the Company "Future Contribution Assessment" ("FCA"). The FCA was carried out in secret and managers were often not informed of their FCA ranking.

75.     Older managers were disproportionately denied a high FCA score whereas younger managers and would routinely receive a disproportionately higher ranking.

76.     The Company used an evaluation tool known as "Key Talent." Managers who made the Key Talent list received promotional opportunities which were not available to managers who did not make the Key Talent list.

77.      In order to be placed on the Key Talent list, a manger should have enough work life left to secure two promotions.  This means that older managers who do not have as much work life left would never make it on the Key Talent list.  This program was and remains infected with age bias because it favors younger managers over older managers.

78.     Prior to terminating Plaintiffs' employment under the SIRP, Ford knew or should have known that the SIRP/forced ranking program, the Key Talent and the FCA programs would result in the termination of employees based on age, based on (1) disparate impact analyses and estimates completed by Ford which, if properly performed and validated, showed or would have shown discrimination based on age; (2) Ford's prior experiences with the same or similar forced ranking and evaluation programs that have resulted in the termination of employees based on age; and (3) statistical and other analyses known to Ford showing that its forced ranking process discriminates against older employees based on age.

79.     In selecting managers for the Wave Four 2019 SIRP, Ford utilized the results of these programs contaminated by age bias resulting in older managers disproportionately selected for termination in Wave Four.

**E.     Statement of Facts Regarding Monica Nicolaysen Dowhan**

80.     Dowhan, a white female, born on July 31, 1966 (52.8 years old) was hired by the Company on May 21, 1990 (29.2 years of Service).

81.     On May 21, 2019, Dowhan was advised by Ford that she was selected for termination in the Wave Four 2019 SIRP. Dowhan's last day of work at Ford was May 31, 2019.

82.     On her notification day, Dowhan was employed as a LL5 Manager working at Ford's Headquarters in Dearborn, Michigan with the title of Manager of Governance, Risk and Compliance and Six-Sigma Deployment Director for Finance.

83.     Dowhan was notified of termination by her Global Director Tozia May ("May").  When Dowhan asked for the reason for her separation, May said that "your termination is based on the numbers of people Ford needs to take out."  May assured Dowhan that her termination was not based on her performance but instead was "based on the requirements to meet the numbers." Dowhan asked May if she could be bridged to 30 years to hit the pension milestone and May's answer was "I don't know."

84.     Dowhan had a remarkably strong employment record with Ford over her 29.2 years of service to the Company, receiving high marks on her performance evaluations, numerous promotions, regular merit increases, generous performance bonuses and other forms of compensation in recognition of her outstanding career with Ford.

85.     Over the last five years, Dowhan was a Top Achiever (highest performance category) for 2014, Achiever (second highest performance category) for 2016 – 2017 and 2018 High end Achiever.

86.     Dowhan's 2018 performance was evaluated at 110% of Bonus Award putting her in the Achiever Plus category.

87.   In her latest 2016 "360 Development Feedback" her Direct manager wrote that "Monica, you are effective at mobilizing others to get big jobs done; I have seen it over and over again…When I have hit the "hard" button on a new project, you are always on top of my list to take the lead! You are very focused and engaged in meetings, and don't multi-task the way many people do.  You are a team player and help out the rest of the team when they need it. And regardless of workload, you are very dedicated to leadership in recruiting.  It is a pleasure working with you and I truly appreciate how hard you work for Internal Control, Finance and the Company."

88.   Dowhan's 2018 base salary was $171,103.82, with a performance bonus of $20,196 and a stock award of $15,500.

89.   Peter Toloday ("Toloday"), Internal Control Manager with approximately 22 years of service and at approximately age 44 has been assigned to perform a majority of Dowhan's job duties.

90.   Toloday was less qualified than Dowhan for the position he will hold going forward.

91.    On May 23, 2019, Rebecca Clark ("Clark") from Human Resources held a Webex for approximately 100 SIRP recipients. Those in attendance were assured that Bridging would be considered on an individual basis.  To initiate Bridging, employees would have to make the request to their "notifying manager." After Dowhan informed May of her situation, May remarked that she was "unaware of the severe consequences" of her termination, and advised Dowhan that she would submit the Bridging request to Human Resource Management because "this is something a notifying manager could not decide."

92.    Employees on the Webex who needed Bridging became vocal and agitated and started making requests to be considered for Bridging.

93.    May submitted Dowhan's Bridging Request to Human Resources on May 24, 2019.

94.    On May 28, 2019, Dowhan met with Meeta Huggins ("Huggins"), Human Resource Director for Finance and Office of the General Counsel. Huggins told Dowhan, "Bridging is a slippery slope, if you were days or months away [from a Service or Age Milestone] before the end of 2019 maybe. Because you will go into early 2020 [to get to the Service Milestone], your request will likely not be approved. This is not a Human Resource decision, but a business decision."

95.     Dowhan asked Huggins "what is the criteria for granting a Bridging request?"  Huggins avoided answering Dowhan's question stating, "the right people will look at the situation." Dowhan asked Huggins if Chairman William Ford knew about her situation, to which Huggins replied, "the right people have been forwarded this request."

96.     Dowhan asked if she could take a demotion in order to allow her to continue working until she reached her Service Milestone. Dowhan's request was denied. Also, a LL6 manager who had a Top Achiever rating for 5 years in a row was terminated with Dowhan.  This LL6 was not offered a demotion to keep a position with the Company even though on June 22, 2019 Ford publicly advertised for 6 finance positions available to new hires only.

97.     On May 31, 2019, Dowhan's last day of employment with Ford, she sent the following letter via email to Company Chairman William "Bill" Ford:

> I am writing to you on my last day at Ford as the Governance Risk, and Compliance (GRC) Manager.  This new GRC system that I was responsible to launch has completed the main launch of the first three modules on time on 5/31/2019.  It is a sad day for me, but I will move forward and plan to help Veterans with all my background as a process improvement expert.  In my present job for the rest of the day today as the Risk Manager, I am alerting you to a significant risk for the company that I hope can be resolved.  I have today raised an Operationally Identified Comment (OIC) in the new GRC system that I just launched.  The following are key excerpts from the GRC system OIC (COM-573633):

A review should be completed to ensure that the SIRP payments to individuals in the category 25-30 years of service and between 50-55 years of age is fair and reasonable. The algorithm to calculate the amounts appears to be setup based on outdated employment practices when "golden handcuffs" were in place to give people incentive to commit to 30 years with the company or more. Now that the table is turned and people are terminated close to this retirement date, cutting the pension amount by the levels calculated by the pension system appears to be unreasonable. It also appears that some people are being bridged to retirement milestones in some organizations. Per a video from Ford Credit's McClelland it is stated that this was done in wave 3 and expect to have it done wave 4 as well. We plan to "do the right thing" by our people.

The present pension system calculates the pension with trigger dates at 30 years of service or 55 years of age. The pension is cut approximately by 50% if one is short months (or perhaps even days) of the milestone. For example, a person eligible to retire on 5/31/2020 would receive a pension lump sum of $1,221,609 if reaching above 30 years of service on that date. If the person was terminated months before on 2/28/2020 before reaching 30 years of service, the pension estimate was reduced to $645,112.

If someone starts working at age 45 and ends at 55 with 10 years of service they qualify for full pension, but not a person with 29.2 years of service and age 52.8. This does not appear to be a reasonable labor practice and treating people fairly. If you do not qualify as retirement eligible, one does not get the retiree group healthcare pool membership and A-plan stops after 3 years from termination date.

A review should be done of these individuals in this category within the 45 day SIRP window for wave 4 to ensure the company practice follows fair labor practices and determine if something can be done to pro-rate or some other reasonable bridge adjustment to retirement eligible status.  To date the response from HR for some people has been there is no provision to handle adjustments for personal circumstances. This does not appear to be the case for all SIRP recipients. There appears to be unfairness even among people in this category that some received consideration and others did not. HR has not provided clear guidance on criteria to qualify for bridging to retirement eligible status.

The potential business impact could be substantial if a class action lawsuit is filed against the company which should be avoided if possible.  The financial exposure could be in the billions of dollars as well as reputational damage.

Various communications are not consistent.   In the benefit Webex for SIRP recipients on May 23, 2019, employees brought up circumstances in which they were months or days away from the milestones and wondered if consideration would be given for bridging to retirement eligible status. Rebecca Clark requested individuals to contact their notifying manager if they wished for their circumstance to be reviewed.  Some individuals had submitted requests and were told it was going to take 5 days for review.   Conflicting feedback appears to be sent out.  If no deviations were going to be accepted, there would be no need to submit a request.

I hope that this email will encourage the company to "do the right thing".  I thank you for many wonderful years of service and international opportunities.  My future contact number is [redacted].  All the best for the future.

Sincerely,


Monica Nicolaysen Dowhan

Governance, Risk & Compliance (GRC) Manager
6-Sigma Deployment Director for Finance
Certified Internal Auditor (CIA)
Internal Control - Corporate Finance Office

98.   Dowhan has not received a response from Mr. Ford.

99.   Under the plain terms of the SRP, Dowhan was eligible for "3+3" bridging, yet none of the Senior Managers who received Dowhan's Bridging request, including Mr. Ford, informed her of her entitlement for a 3+3 Bridge as provided in the SRP.

100.   Because Dowhan was terminated, she could not retire after reaching the Age or Service Milestones, and she will be deprived of a full pension and Retiree Health Care Benefits.

101.   The amount of Dowhan's lump sum pension payment currently offered is $552,594.76.  If Dowhan retired after attaining her Age or Service Milestone or if she Bridged, the value of her lump sum pension would be approximately $1,144,019.00. If she retired at normal retirement age of 65 the lump sum pension would be approximately $2,100,000.

102.   As recently as June 20, 2019, Dowhan located five positions posted by Ford soliciting applications from individuals seeking employment with Ford. Dowhan is well qualified for these positions but because of her termination as part of the 2019 SIRP, she is ineligible for rehiring.

**F.      Statement of Facts Regarding Andrew Kress**

103.    Andrew Kress, a white male with a birthdate of June 20,1965 (54 years old), was a LL5 Manager of Cybersecurity Policy and Strategy working from the Norwood Building in Allen Park Michigan. He had 26.3 years of service to the Company.

104.    Kress was notified of his termination on May 21, 2019.  At that time, Kress had 26.3 years of service with Ford. His day of work was May 31, 2019.

105.    Kress was earning a base salary of $185,784 and for 2018 received a performance bonus of $18,360 and an award of stock valued at $15,500.

106.    Kress had a good employment record with Ford over his 26.3 years of service to the Company, receiving high marks on his performance evaluations, promotions, regular merit increases, performance bonuses and other indicia of an outstanding career with Ford.

107.    Kress is being replaced by a significantly younger, less qualified individual.

108.    Kress's monthly benefit with a Bridge will be $2,280 and with Bridge $4,281.

109.   If Kress takes a lump sum payout without a Bridge he will receive $583,458 and with a Bridge $1,029,901. The Bridge would enable him to receive Retire Health Care Benefits.  Without a Bridge he will receive about 45% of full pension without eligibility for Retire Health Care Benefits.

110.   Kress requested a Bridge so that he could retire with a full pension and Retiree Health Care Benefits.

111.   On June 6, 2019, Kress wrote to Mr. Ford asking for an opportunity to Bridge to a full retirement.  In his email to Mr. Ford, Kress said among other things:

> I am asking that the company be just and reasonable to dedicated employees like myself who have devoted essentially their entire careers to Ford.  Those of us that are 50-55 with 25-30 years' service are being hit with disparate and devasting impacts that we will realistically be unable to recover from, even through additional employment.  Providing a bridge to retirement to those of us in this situation would show that Ford is still the company I have been proud to devote my career to.

112.   On June 12, 2019, Kress' request for a Bridge was denied.

113.   Sandy Krus, Ford's Director of People Matters, answered for Mr. Ford formally denying Kress' request for Bridge.  To add insult to injury, Ms. Krus said "Thank you again for all you have done while at Ford and know you will always be part of the Ford family."

114.   Mr. Ford, Ms. Krus and other Senior Managers of Ford concealed from Kress the 3+3 Bridging entitlement which was part of the SRP.  Kress met all eligibility requirements for a SRP 3+3 Bridge.

27

**G.      Statement of Facts Regarding Mathews V. John**

115.    Mathews V. John is a South Asian male born on January 31,1965 (54 years old) formerly employed by Ford as a LL6 manager in the position of IT Learning and Development Supervisor located at Fords Allen Park facility.  At the time of his termination, John had 24.75 years of Ford Service.

116.    John had a good employment record with Ford over his 24.75 years of service to the Company receiving high marks on his performance evaluations, promotions, regular merit increases, performance bonuses and other indicia of an outstanding career with Ford.

117.    John's base salary for 2018 was $116,000.  He earned performance bonuses taking his 2018 compensation to $124,000.

118.    John has been replaced by a less qualified, significantly younger employee.

119.    John requested a Bridge on June 24, 2019.  His request was denied.

**H.      Statement of Facts Regarding Erik Eliason**

120.    Eliason, a white male, born on April 11, 1966 (53.1 years old) was hired by the Company on July 13, 1992 (27.1 years of credited ERISA Service).

121.    On May 21, 2019, Eliason was advised by Ford that he was selected for termination in Wave Four of the 2019 SIRP. Eliason's last day of work at Ford was May 31, 2019.

122.   On his notification day, Eliason was employed as a LL5 Manager working at Ford's Headquarters in Dearborn, Michigan with the title of Indirect Purchasing Controller and Global Material Cost Manager.

123.   Eliason was notified of termination by his LL4 Director, North American Purchasing Controller Dennis Barrish ("Barrish") When Eliason asked for the reason for his separation, Barrish said that "your position is being eliminated."

124.   When Eliason asked to be redeployed to another position, Barrish said "we do not have another position for you."   When Eliason asked how his long, documented record of strong performance contributions was considered in the determination that he would not be redeployed and instead terminated, Barrish said "your performance record was not considered."   Barrish informed Eliason that "there was very little redeployment, if your position was eliminated you were at a significant disadvantage."

125.   Eliason asked Barrish if he was being offered any 'bridging' to key age and years of service retirement milestones, Barrish said "the details of the severance package are included within the SIRP notification and documentation that I will send to you now, and there is no bridging included."

126.   Eliason had a remarkably strong employment record with Ford over his 27.1 years of service to the Company, receiving high marks on his performance evaluations, numerous promotions, regular merit increases that were generally at the high end of the range, generous performance bonuses and other forms of compensation in recognition of his outstanding career with Ford.

127.   As part of his outstanding career Eliason was also an international service employee ("ISE") for 11.5 years from 2003 - 2014 with back to back assignments in Malaysia (3 years), Thailand (3.5 years) and China (5 years).

128.   Given the demanding and complex nature of international service assignments, such assignments are reserved for high-performing, highly capable employees, with broad experience – and are also provided to such employees as career development in recognition that they are judged to be high-potential employees for the future.

129.   Eliason was rated as an Achiever (second highest performance category) from 2014 through 2016, Top Achiever (highest performance category) in 2017, and in 2018 judged to be within the 'critical few' (equal to Achiever Plus category).   As a result Eliason's incentive compensation award ('performance bonus') for the 2018 performance period was evaluated at 110% of Bonus Target.

130.   In Eliason's 2018 Performance Review Barrish wrote that – "Erik has greatly improved and streamlined the global consolidation process and has refocused and eliminated non-value added work in the Indirect Purchasing role. He allows his LL6s significant latitude in their individual responsibilities.  Erik is effective at drawing from his breadth of experiences to dive into details of globally complex forecast/business plans.  He shows a genuine interest in fully understanding the intricacies of regional issues, which enables him to be effective in presenting the forecast to senior management."

131.   Upon termination on May 31, 2019 Eliason's base salary was $193,685.52.  For the 2018 calendar year he was awarded an incentive compensation performance bonus of $20,196 (110% of target – 'critical few') and a restricted stock award of $15,500.

132.   Chris Marrocco ("Marrocco"), and Kate Noser ("Noser"), both LL6 Finance Analysts reporting to Eliason with approximately 20-25 years of experience and approximately age 45, have been assigned to perform a majority of Eliason's job duties.   Both Marrocco and Noser are less qualified than Eliason for the responsibilities they will hold going forward.   In addition, a portion of Eliason's former role has been assigned to his LL4 Director, Dennis Barrish

133.   On June 5, 2019, Eliason sent the following letter via email to Company Chairman William "Bill" Ford, CFO Tim Stone, and Chief Human Resources Officer Kiersten Robinson.  The letter stated in part:

> I am 53 years old, and after 27.1 years of dedicated service with the Finance skill team was separated from the Company on May 31 under the SIRP. My understanding through other SIRP participants' feedback from NESC is that a re-review of SIRP terms and conditions may already be underway. Either way, I am writing to you in the hope that you can help drive a reconsideration of certain elements of the SIRP program to ensure they are <u>fair and reasonable</u>.
>
> Under the present SIRP terms and conditions there is <u>significant inequality</u> in the post-employment benefits that are being provided to SIRP participants –
>
> - SIRP participants that are retirement eligible under present policy (age 55 with minimum 10 years of service, or any age with 30 years of service) leave Ford with their pensions intact, retiree healthcare benefits, and access to the A-plan vehicle purchase program
>
> - However, there are SIRP participants, myself included, that are very close to retirement age and with substantial years of service that fall just outside the present retirement eligibility requirements.  For us, our pensions are being cut by more than half, we maintain A-plan eligibility for only 3 years, and we will have no access to retiree healthcare from Ford
> ………………………………
> I wish to remain prideful in Ford, and prideful in my Ford working career - a span that represents over 50% of my living years, and a span that will far surpass any remaining working career. As a long-serving former employee, and current shareholder, I am concerned about reputational risk for Ford, as well as potential legal exposure.

I very respectfully request your personal involvement in the further review of post employment benefits under the SIRP to ensure Ford is treating retirees/former employees with equality, respect, and decency.

Thank you,
Erik Eliason

134.    Eliason has not received a response from Mr. Ford or Mr. Stone.

135.    On June 12, 2019 Eliason received the following from Sandy Krus:

Thank you for your email and more importantly all your contributions to Ford. We realize the impact of the redesign of the business can be a very challenging experience, especially for those leaving the Company. While Smart Redesign is an important step forward for Ford, unfortunately it has meant that we must let some Ford employees go, including employees who made valuable contributions to the Company over the years. Please know that we have been very thoughtful in structuring the Smart Redesign separation process to ensure we are treating employees fairly and consistently. The effective date for Wave 4 Smart Redesign Salaried Involuntary Reduction Process (SIRP) separations was established as 5/31/19 and your benefits eligibility is based off of that date. Ford is not in a position to reconsider or extend your separation date to bridge you to retirement eligibility, but it is offering a severance package under SIRP that we hope will help you during this transition, including competitive severance amounts, extended medical benefits, and career transition services through Right Management. Right Management has a high success rate of placement for individuals who elect to continue working, and we encourage you to begin engaging with them. Thank you again for all you have done while at Ford and know you will always be a part of the Ford family.

Sandy Krus
Director, People Matters
Ford Motor Company

136.    Eliason has not received a response from Mr. Thai-Tang, Mr. Galhotra, Mrs. Drake or Mr. Field.

137.   Under the plain terms of the SRP, Eliason was eligible for "3+3" bridging, yet none of the Ford management who received Eliason's Bridging request, including Mr. Ford, informed him of his entitlement for a 3+3 Bridge as provided in the SRP. Because Eliason was terminated, he could not retire after reaching the Age or Service Milestones, and he will be deprived of a Full Pension, Retiree Health Care Benefits, and access to the Company's Employee Vehicle Purchase Plans.

138.   The amount of Eliason's lump sum pension payment currently vested is about $600,000.  If Eliason retired after attaining his Age milestone or if he was bridged to the Age milestone, the value of his lump sum pension benefit would be approximately $1.2 million. If Eliason retired after attaining both his Age and Service milestones or if he was bridged, the value of his lump sum pension benefit would be approximately $1.4 million.

139.   Given the majority of Eliason's adult working career was with Ford, his remaining working career is likely insufficient to qualify for retiree healthcare benefits from a new employer and thus Eliason will be required to personally bear the full burden of health care expenses.

## I.   Class Allegations Regarding Denial of Bridging to Age or Service Milestones

140.   Plaintiffs request certification pursuant to Fed. R. P 23(b)(3) on behalf a damages class consisting of all former Ford LL5/LL6 managers or above hired before January 1, 2004 who were terminated between the ages of 52 and 55 or who had 10 years and were less than three years short of 30 years of Ford Service and whose Bridging request was denied regardless of the Class Members retirement status.

141.   Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2) on behalf of a proposed injunctive relief class defined as Ford LL5/LL6 managers who meet the definition of the damage class and who would benefit from an order of the court granting them the Bridging rights set forth in the SRP and other Ford ERISA Plan language consistent with Bridging rights.

142.   Plaintiffs request certification pursuant to Fed. R. Civ. P 23 (c)(4) on behalf of Class Members who seek a class determination that all LL5/LL6 Ford Managers meeting the damage class definition should have been granted Bridging to their Age or Service Milestone.

143.   The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class wide equitable injunctive relief.

144.   There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent. Such common questions predominate over question affecting only individual members of the Class(es). The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

145.   Plaintiff Class representatives will fairly and adequately protect the interests of the Plaintiff Class members. Plaintiffs' counsel are unaware of any conflicts of interest between the Class representatives and absent Class members with respect to the matters at issue in this litigation; the Class representatives will vigorously prosecute the suit on behalf of the Class; and the Class representatives are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving employment law issues.

146.   There is no conflict between Class Representatives because the LL5 Plaintiffs and Class Members did not make any relevant employment decisions relative to the LL6 Plaintiffs or Class Members.

147.   Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class.

148.   The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice.   Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

149.   Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

## COUNT I
## VIOLATION OF ERISA §510

150.   Plaintiffs incorporate by reference all the allegations contained above.

151.   Section 510 of ERISA, 29 U.S.C. §1140, makes it unlawful "[f]or any person to discharge, fine, suspend, expel, discipline or discriminate a participant or beneficiary… for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, [or] this title." 29 U.S.C. §1140.

152.   The prohibitions of § 510 are aimed primarily at preventing employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.

153.  By its terms, § 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting. However, the protections of § 510 are not limited to vested pension rights. The Sixth Circuit clarified that § 510 prohibits interference with rights to which an employee 'may become entitled' under 'an employee benefit plan' and does not limit its application to benefits that will become vested.

154.  Unlawful interference under Section 510 includes terminating an employee in order to interfere with the employee's ability to receive future benefits under an ERISA plan.

155.  ERISA Section 510 was designed to protect the employment relationship which gives rise to an individual's pension rights. This means that a fundamental prerequisite to a § 510 action is an allegation that the employer-employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way.

156.  In this case, Ford intentionally terminated Plaintiffs' employment pursuant to the SIRP in order to interfere with Plaintiffs' ability to receive identifiable ERISA Plan benefits, specifically (1) "55 and 10" early retirement benefits under the GRP; (2) "30 and Out" supplemental benefits" under the GRP; and (3) "3+3 Bridge" benefits under the SRP.

157.   In selecting employees for termination under the SIRP, Ford utilized an algorithm constructed to target employees for termination based on proximity to age or service milestones.

158.   There is evidence that Ford was concerned about high GRP legacy costs attributable to older employees, such as Plaintiffs, who were close to attaining full GRP benefits in the form of "55 and 10" or 30 year retirement benefits.

159.   Both internally and publicly, Ford expressed its worry about increasing pension liabilities in the form of pension benefits that would be payable to aging management level employees, including Plaintiffs, who were approaching but still short of their "55 and 10" early retirement benefits and "30 and out" supplemental pension benefits.

160.   The highest members of Ford Senior management expressed the intention and give directives to terminate employees in the SIRP process if they were hired before January, 2004.

161.   When Plaintiffs and other employees inquired with Ford about the availability of bridging rights, Ford deliberately concealed their rights under the SRP, which would have afforded them "3+3 Bridging" to preserve their GRP early retirement and supplemental pension benefits.

162.   These acts of concealment were carried out in conjunction with the SIRP as part of the formal process for terminating Plaintiffs' employment under the SIRP.

163.   Ford's intention to interfere with the Plaintiff's GRP and SRP benefits was a determining factor in its decision to terminate Plaintiffs' employment in the SIRP.

164.   Plaintiffs were all approaching vesting in full GRP benefits, and this proximity to vesting provides an inference of intentional, prohibited interference in violation of 510.

165.   Plaintiffs have standing to bring their 510 claims against Ford because they are employees or former employees of Ford who are or may become eligible to receive a benefit from the GRP, an employee benefit plan, and are therefore "participants" in the GRP.

166.   As a result of Ford's violation of Section 510 of ERISA, 29 U.S.C. §1140, Plaintiffs have suffered and will continue to suffer damages in the form of lost salary and benefits, including GRP benefits.

167.   Accordingly, to redress the violations of ERISA §510 alleged in this action, Plaintiffs request the following relief from this Court:

        a.  A declaration that the GRP is an ERISA plan;

        b.  A declaration that the SRP is an ERISA plan

c. A declaration that Ford violated Plaintiffs' rights under §510 of ERISA when it terminated Plaintiff's employment in order to interfere with their ability to receive future benefits under the GRP;

d. A declaration that Ford violated Plaintiffs' rights under §510 of ERISA when it terminated their employment and concealed their rights to "3+3 Bridging" under the SRP;

e. An equitable order of reinstatement to their prior positions or to comparable positions of employment with Ford, or an equitable order of front pay in lieu of reinstatement;

f. An order of equitable relief awarding GRP benefits, or other monetary compensation, in order to make Plaintiffs whole;

g. An order of any other equitable and/or legal relief the court deems necessary to enforce Plaintiffs' rights under ERISA, including but not limited to an order requiring Ford to provide Plaintiffs "3+3 Bridging" under the SRP; and

h. An award of attorneys' fees and costs.

## COUNT II
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## DISPARATE TREATMENT – AGE DISCRIMINATION

168. Plaintiffs incorporate by reference all the allegations contained above.

169.   At all relevant times, Ford was Plaintiff's employer within the meaning of the ELCRA, MCL §37.2201(a).

170.   As an employer under the ELCRA, Ford is prohibited from limiting, segregating or classifying an employee in a way that deprives or tends to deprive the employee of an employment opportunity because of the individual's age, or to otherwise discriminate against an individual with respect to employment, compensation or a term, condition or privilege of employment because of the individual's age.

171.   In violation of the statutory duties set forth in the ELCRA, the Ford Motor Company discriminated against Plaintiffs in the way it targeted them for termination as part of the Company's SIRP/forced ranking reduction-in-force program which caused the company to terminate employees on the basis of age.

172.   In further violation of its duty, the utilization of the SIRP/forced ranking reduction-in force program and a discriminatory algorithm resulted in older salaried employees, including Plaintiffs, receiving less favored treatment than similarly-situated younger employees, resulting in their termination from employment.

173.   Prior to terminating Plaintiffs' employment under the SIRP, Ford knew or should have known that the SIRP/forced ranking program and the discriminatory algorithm would result in the termination of employees based on age, based on (1) disparate impact analyses and estimates completed by Ford which, if properly completed, showed or would have shown discrimination based on age; and (2) Ford's prior experiences with the same or similar forced ranking programs that have resulted in the termination of employees based on age.

174.   The Company's policies as described in the Complaint constitute a pattern and practice of discrimination because the unlawful discrimination was a regular procedure or policy of the Company as evidenced by the Company's history of using forced ranking systems which have been proven to be highly discriminatory toward its older employees.

175.   Accordingly, Plaintiffs request the following relief from this Court:

    a.   An order of this Court declaring that the SIRP/forced ranking reduction-in-force program utilized by FMC to select individuals for layoff violates the ELCRA and enjoining the further application of said policies and practices;

    b.   An order of this Court awarding Plaintiffs all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this Complaint;

    c.   An order of this Court reinstating Plaintiffs to employment with Ford in positions comparable to those which they held at the time they were terminated;

43

    d. An order of this Court awarding interest, costs and attorney fees; and

    e. An order of this Court awarding such other relief as this Court deems just and equitable.

## COUNT III
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## DISPARATE IMPACT – AGE DISCRIMINATION

176. Plaintiffs incorporate by reference all the allegations contained above.

177. The implementation of the SIRP/forced ranking reduction-in force program and the use of an algorithm while purportedly designed to be "neutral," violates the ELCRA's prohibition against age discrimination in that its application had a disparate impact on the Company's older salaried employees considered for separation.

178. As a direct result of the disparate impact on the basis of age, Plaintiffs have suffered, and will continue to suffer, all of the injuries and damages as set forth above.

179. Accordingly, Plaintiffs request the following relief from this Court:

    a. An order of this Court declaring that the SIRP/forced ranking reduction-in-force program utilized by FMC to select individuals for layoff violates the ELCRA and enjoining the further application of said policies and practices;

b. An order of this Court awarding Plaintiffs all economic losses, lost wages and benefits, and other forms of compensation, economic and non-economic damages, past and future, resulting from the discriminatory treatment described in this Complaint;

c. An order of this Court reinstating Plaintiffs to employment with Ford in positions comparable to those which they held at the time they were terminated;

d. An order of this Court awarding interest, costs and attorney fees; and

e. An order of this Court awarding such other relief as this Court deems just and equitable.

Respectfully submitted,

Pitt, McGehee, Palmer and Rivers PC

By: */s/ Michael L. Pitt*
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com

Kevin M. Carlson PLLC
Kevin M. Carlson (P67704)
Attorney for Plaintiffs
P.O. Box 6028
Plymouth, MI 48170
(734) 386-1919 (phone/fax)
kevin@kevincarlsonlaw.com

Date:  June 27, 2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONICA NICOLAYSEN DOWHAN, ERIK ELIASON
ANDREW KRESS, MATHEWS V. JOHN, individually
and on behalf of similarly situated LL5/LL6
employees,                                          **CLASS ACTION**

      Plaintiffs,                                      Case No.
vs.                                                 Hon.

FORD MOTOR COMPANY,
a Delaware Corporation,

      Defendant.

---

Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Pitt, McGehee, Palmer and Rivers PC
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com

Kevin M. Carlson (P67704)
Kevin M. Carlson PLLC
Attorney for Plaintiffs
P.O. Box 6028
Plymouth, MI 48170
(734)386-1919 (phone/fax)
kevin@kevincarlsonlaw.com

---

**DEMAND FOR JURY TRIAL**

46

Plaintiffs demand a trial by jury as to all issues raised in this action.

Respectfully submitted,

Pitt, McGehee, Palmer and Rivers PC

By: */s/ Michael L. Pitt*
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
(248) 268-7996 (fax)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com

Kevin M. Carlson PLLC
Kevin M. Carlson (P67704)
Attorney for Plaintiffs
P.O. Box 6028
Plymouth, MI 48170
(734) 386-1919 (phone/fax)
kevin@kevincarlsonlaw.com

Date:  June 27, 2019