UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONICA NICOLAYSEN
DOWHAN, ERIK ELIASON
ANDREW KRESS,
MATHEWS V. JOHN,
REMO MORRONE,
SUSAN QUICK, SUZANNE          Case No. 19-cv-11923
TWOMLEY, and
CHING PEI, individually and     Hon. Bernard A. Friedman
on behalf of similarly situated LL5/LL6   United States District Judge
employees,
                                Mag. Judge: Anthony P. Patti

        Plaintiffs,

vs.

FORD MOTOR COMPANY,
a Delaware Corporation,

        Defendant.

---

**PLAINTIFFS' MOTION TO COMPEL RESPONSES TO FIRST
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF
DOCUMENTS AND REQUEST FOR AN AWARD OF ATTORNEY FEES
AND EXPENSES**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Index of Authorities .................................................................................iii

INTRODUCTION ....................................................................................1

    I.    Statement of Plaintiffs' request for relief ................................1

    II.    Case Summary .........................................................................1

    III.    Available documentary evidence shows Ford's intention to target
          employees for separation based on age and proximity to pension
          milestones. .............................................................................2

    IV.    Ford has produced limited data which, under a proper analysis,
          demonstrates statistically significant disparities based on age
          and proximity to pension milestones, in support of Plaintiff's
          discrimination claims...............................................................3

STATEMENT OF FACTS .......................................................................6

    I.    Background...............................................................................6

    II.    Smart Redesign and SIRP Reduction-In-Force Program.......7

STANDARD OF REVIEW .......................................................................8

ARGUMENT ...........................................................................................9

    I.    Discovery of aggregate statistical data is the norm in employment
          discrimination cases.................................................................9

    II.    Statistical evidence is unquestionably relevant and proportional in this
          discrimination case where Ford terminated Plaintiffs' employment as part
          of a reduction-in-force based on centralized and company-wide
          guidelines and policies. ..........................................................14

III.   The available statistical evidence, derived only from the "decisional units" from which Ford selected Plaintiffs for termination, demonstrates statistically significant discrepancies, of more than two standard deviations, based on age and proximity to pension milestones. ............15

    A. Standard deviation test. .........................................................15

    B. The limited decisional unit data provided by Ford reveals a statistically significant disparity, greater than two standard deviations, based on age and proximity to pension milestones................................................................................16

    C. Even though the available data is probative of age discrimination and interference with pension benefits, the Court should order Ford to produce aggregate company-wide data to ensure meaningful statistical analysis. ...............17

    D. Ford's limited data production impedes more meaningful statistical analysis...................................................................18

    E. Data from Plaintiffs' decisional units impedes the "search for truth" and precludes Plaintiffs from determining the full extent to which the centralized RIF program was biased against older employees and employees who were close to pension milestones. .................................................................21

    F. The report submitted by Ford's Expert, Dr. Michael Ward, establishes that full disclosure of aggregate company-wide data is essential to the statistical analysis of SIRP terminations and opens the door to production of full and complete data. .........23

CONCLUSION AND RELIEF REQUESTED ......................................................24

# INDEX OF AUTHORITIES

## Cases

*Arthur v. American Showa, Inc.*, No. 14-4145, 625 F. App'x 704, 707 (6th Cir. Aug. 14, 2015) ................................................................................14

*Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1469. (6th Cir. 1990) ...............................14

*Barr v. Smith & Wollensky Rest. Grp., Inc.*, 238 F.R.D. 222, 224 (S.D. Ohio 2006) ...............................................................................................................18

*Becker v. ARCO Chemical Co.*, 207 F.3d 176, 194 n.8 (3rd Cir. 2000).................21

*Black v. City of Akron*, 831 F.2d 131 (6th Cir.1987)................................................10

*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) ................ 14, 21

*Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 766-767 (3rd Cir. 1989) ...................20

*Capaci v. Katz & Besthoff*, 711 F.2d 647, 653-54 (5th Cir.1983)..................... 10,18

*Carter v. Michigan State Police*, No. 349368, 2020 WL 4036516, at *7 (Mich. Ct. App. July 16, 2020).................................................................................13

*Castaneda v. Partida*, 430 U.S. 482, 496-497, n. 17 ..............................................15

*Coates v. Johnson & Johnson*, 756 F.2d 524, 541–42 (7th Cir.1985) ...................12

*Cook v. Boorstin*, 763 F.2d 1462, 37 FEP 1777 (D.C.Cir.1985)............................11

*Durand v. Hanover Ins. Grp., Inc.*, 2016 WL 9458551 at *2 (W.D. Ky. 2016) .......8

*EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, (7th Cir.1988) ..............................18

*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 522 (N.D. Cal. 2012) ..............12

*Goree v. United Parcel Serv., Inc.*, 2015 WL 11120732, at *3 (W.D. Tenn. 2015).......................................................................................19

*Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 308-309 & n. 14 (1977)...............15

*Hodgson v. First Federal Savings & Loan Association*, 455 F.2d 818 (5th Cir. 1972) ....................................................................................................20

*James v. Stockham Valves and Fittings Co.*, 559 F.2d 310 (5th Cir.1977)............18

*Lilly v. Harrison-Teeter Supermarket*, 720 F.2d 326 n. 17, 33 FEP 195 (4th Cir.1983) ...........................................................................................11

*Louzon v. Ford Motor Co.*, 718 F.3d 556, 563 (6th Cir.2013) ...............................19

*McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 754 (5th Cir. 1980) ........................20

*Pace v. Southern Ry. System*, 701 F.2d 1383, 1388 (11th Cir. 1983).....................20

*Paige v. California*, 291 F.3d 1141, 1148 (9th Cir.2002) .......................................12

*Raczak v. Ameritech Corp.*, 103 F.3d 1257, 1263 (6th Cir. 1997) .........................10

*Seay v. TVA*, 339 F.3d 454, 479–80 (6th Cir.2003)................................................19

*Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 485 (6th Cir.2008).......................................................................................17

*Siser North America, Inc. v. Herika G., Inc.*, 325 F.R.D. 200 (E.D Mich. 2018).....9

*Smith v. City of Jackson, Miss.,* 544 U.S. 228, 239 (2005) .....................................14

*Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1327 (11th Cir. 2011) ..............20

*State of Alabama v. United States*, 304 F.2d 583, 586 (5th Cir.), aff'd, 371 U.S. 37 (1962)..........................................................................................................................9

*Vance v. Rice*, 524 F. Supp. 1297, 1300 (S.D. Iowa 1981) .......................................5

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)..............................................13

*Wheeler v. City of Columbus, Mississippi*, 686 F.2d 1144, 1151 (5th Cir.1982)....10

*Williams Int'l Co., LLC v. Zurich Am. Ins. Co.*, No. 2:20-CV-13277, 2021 WL 1056844, at *1 (E.D. Mich. Mar. 19, 2021) ..........................................................5

**Rules**

Fed. R. Civ. P. 37(a)(5)(A) ........................................................................................9

Fed. R. Civ. P. 37(d)(3)...............................................................................................9

## INTRODUCTION

### I.     Statement of Plaintiff's request for relief

In this motion to compel, Plaintiffs request that the Court enter an order compelling Ford to produce complete company-wide data showing the statistical outcome of the 2018-2019 reduction-in-force program known as Smart Redesign ("SRD")/Salaried Involuntary Reduction Process ("SIRP"). Plaintiffs request that the full data set include company-wide data showing all LL5 and LL6 employees selected and not selected for termination in the four waves of Smart Redesign/SIRP, and for each employee, identification of their name, date of birth, date of hire, salary grade, job title as of 5/21/19, work group, business unit, most recent (2019) performance review rating[1], and the name, salary grade, and job title of their direct supervisor.

### II.    Case summary

This employment discrimination action arises out of the termination of Plaintiffs' employment by Defendant. Ford terminated Plaintiffs' employment in a reorganization process known as Smart Redesign ("SRD") and separation program known as the Salaried Involuntary Reduction Process ("SIRP.") Plaintiffs allege that

---

[1] Disclosure of performance review ratings is warranted, in part, because Ford's statistical expert, Dr. Michael Ward, opined that the statistical analysis of terminations should control for performance. Ford also used performance ratings as a factor to select employees for separation and Plaintiffs have alleged that the performance rating system is biased against older employees.

Ford targeted and selected employees for termination based on age, date of hire, and eligibility for and proximity to critical pension milestones under the Ford General Retirement Plan ("GRP")." (ECF No. 5, First Amended Complaint).[2]

## III. Available documentary evidence shows Ford's intention to target employees for separation based on age and proximity to pension milestones.

Documents produced in discovery confirm that the SRD/SIRP program was a central, company-wide program designed to target and separate older employees and to favor younger employees. Ford's discriminatory intent emanated from the highest levels of the company.

The Board of Directors of Ford Motor Company reviewed the Smart Redesign Program and instructed management to use the program to eliminate older workers in order to make room for younger employees in the organization. See Exhibit 1, filed under seal.[3] Thus, it is clear that Ford implemented Smart Redesign with an

---

[2] At Ford, a salaried employee's date of hire is integral to pension status. Salaried employees hired before January 1, 2004, such as Plaintiffs, were eligible for defined pension benefits under Ford's General Retirement Plan ("GRP). These benefits include early retirement benefits for employees who reach age 55 and 10 years of service ("55 and 10" benefits) and early retirement subsidies for employees who reach 30 years of service ("30 and out" pensions). Employees hired or rehired after January 1, 2004 are not eligible for these benefits.

[3] Ford designated Exhibit 1 "confidential" pursuant to the Protective Order entered on June 9, 2020. ECF No.25. Thus, Plaintiffs submitted the email under seal to the Court, pursuant to Paragraphs 5(g) and 15 of the Protective Order. ECF NO. 25,

intention to select older employees for separation and to use the process to favor younger employees. In an email dated December 28, 2018, Graydon Reitz, a senior Ford executive, summarized his knowledge of the Smart Redesign Program as follows:

> Ford is in the process of a 'Smart Organization Redesign' that is targeted to eliminate 25% of the LL6 through LL2 population by 2nd quarter 2019. **They are targeting the most senior leaders first (29+ years of service and 50+ years old).** Exhibit 2 – Reitz Email (emphasis added).

## IV. Ford has produced limited data which, under a proper analysis, demonstrates statistically significant disparities based on age and proximity to pension milestones, in support of Plaintiff's discrimination claims.

In discovery, Plaintiffs requested demographic data showing employees selected and not selected for termination under Smart Redesign/SIRP, including age, date of hire, and proximity to GRP milestones, to determine whether Ford engaged in disparate treatment based on those criteria, and whether the implementation of Smart Redesign/SIRP had a disparate impact based on those attributes.

Ford initially refused to produce data reflecting the employees eligible and selected or not selected for separation under Smart Redesign/SIRP. Plaintiffs

---

PageID 249 and ECF No. 25, PageID 253. Pursuant to Paragraph 15 of the Protective Order, Plaintiffs have presented the exhibit to the Court for endorsement with an explanation why the portion of the document is confidential and have sought to obtain the Court's endorsement on a cover page consistent with Local Rule 5.3. Plaintiffs have filed this motion with a redacted version of the exhibit pursuant to Local Rule 5.3(b)(3)(B).

informed Ford that they intended to file a motion to compel production of the requested data. Ford then agreed to produce a set of data limited to the "decisional units" from which it selected Plaintiffs for termination.

Plaintiffs' statistical expert, Dr. David Macpherson, analyzed this data and found that it is probative of discrimination because (1) there are significant disparities between the number of older (age 50 and older) employees that one would expect to be terminated and the number actually terminated, and this disparity is statistically significant; and (2) there are significant disparities between the number of close-to-pension employees (i.e., within for years of vesting) one would expect to be terminated and the number actually terminated, and this difference is also statistically significant. Ex. 3 – Macpherson report. Plaintiffs' expert also cautioned that "[i]t would be necessary to have data from the remaining decisional units across the company to make a conclusion about all LL5/LL6 managers" who were age 50 or older or were close to receiving a pension benefit. *Id*.

Thus, the available data is large enough to complete an analysis, and the data is probative of discrimination because of age and proximity to pension milestones. By refusing to provide company-wide data, Ford is withholding the information necessary for a more meaningful comparison between terminated and non-terminated employees based on age, date of hire, and proximity to GRP milestones.

Furthermore, as discussed in greater detail below, the analysis of Ford's own statistical expert opens the door to a full company-wide data set.

In sum, analysis of a smaller data set, already produced, shows statistically significant disparities based on age and proximity to pension milestones. These findings are strongly suggestive of discrimination. But the available data and surrounding evidence also establish the need for production of the larger data set, particularly given the disputed issues raised by the parties' expert reports.

For purposes of clarity, Plaintiffs expressly do not concede that the current statistical analysis is inadequate based on the smaller data set. Rather, Plaintiffs argue that a larger data set is required to resolve the issues raised in Defendant's expert report and to make meaningful findings about the actual impact of SRD/SIRP on all LL5/LL6 managers. See Ex. 4, Dr. Ward report and Ex. 5, Declaration of Dr. Macpherson.

Plaintiffs also expressly acknowledge that production of the larger data set could alter the statistical findings and demonstrate a lack of discriminatory outcomes. It is possible that more data will hurt Plaintiffs' case and be helpful to Ford's case. It is axiomatic, however, that "[a] lawsuit is a search for the truth." *Williams Int'l Co., LLC v. Zurich Am. Ins. Co.*, No. 2:20-CV-13277, 2021 WL 1056844, at *1 (E.D. Mich. Mar. 19, 2021)(Patti, Magistrate Judge)(quoting *Vance v. Rice*, 524 F. Supp. 1297, 1300 (S.D. Iowa 1981). Plaintiffs therefore request entry

of an order compelling Ford to produce a company-wide data set for purposes of statistical analysis, and an order requiring Ford to pay Plaintiffs' reasonable costs and attorney fees as a sanction under Rule 37.

## STATEMENT OF FACTS

### I.   Background

Ford maintains a General Retirement Plan ("GRP"), which is a traditional, defined benefit pension plan that pays fixed monthly or lump sum pension benefits to eligible Ford employees. Am. Compl., ¶50, ECF No. 5, Page ID.64. At the time of the termination of their employment, Plaintiffs were on the verge of reaching eligibility milestones for valuable early retirement and supplemental pension benefits under the GRP, specifically: 1) "55 and 10" early retirement, under which they could obtain a full retirement at age 55 with ten years of service; and (2) the "30 and Out" pension supplement, under which employees with at least 30 years of credited service who take early retirement are eligible for an additional monthly pension payment until the age of 62. Am. Compl., ¶52, ECF No. 5, Page ID.65.

As of 2012, Ford's global pension funds were underfunded by $19 billion. Am. Compl., ¶56, ECF No. 5, Page ID.65. Over the course of several years, Ford took significant measures to "de-risk" and shift pension liabilities off its books, such as providing lump sum payouts in lieu of lifetime benefits. Am. Compl., ¶¶54-61, ECF No. 5, Page ID.65-67.

In this context, Ford implemented Smart Redesign and the SIRP for the purpose of assuring shareholders, potential investors, and Wall Street analysts that it was moving potential pension liabilities off its books. "Investors in the past year [2018-2019] have repeatedly asked [Ford CEO Jim] Hackett for firm numbers about the size of the salaried workforce reductions." Exhibit 5 – "Final wave of salaried job cuts hits ford this week," The Detroit News, May 20, 2019. In the lead up to Smart Redesign, "Ford [had] been on a cost-cutting push since 2017. It aim[ed] to cut $25.5 billion from its operating costs over the next few years. That's coupled with an $11 billion global redesign, which includes the salaried workforce cuts." *Id*.

## II.    Smart Redesign and SIRP Reduction-In-Force Program

Ford used its Smart Redesign and SIRP termination process in selecting which salaried employees would be retained or terminated. ECF No. 19, Answer, ¶3, Page ID 160.  In the "design phase" of Smart Redesign, managers certain selected business restructured and redefined the positions in their business units, resulting in a new organizational chart for each unit.[4] Then, in the "staffing" phase, managers selected

---

[4] The wisdom of Ford's business decision to redesign is not at issue, but the process by which Ford came to select Plaintiffs and other terminated employees for separation, i.e., its decision to design *these* people out of the company, is at issue. If the design program was designed to discriminate, as in this case where the Board of Directors used SRD/SIRP to eliminate older workers to make room for junior employees. Thus, evidence about its statistical outcomes is relevant and discoverable for Plaintiffs' disparate treatment claims. If the design program was neutral in its

which employees would be retained and which would be terminated.  Ford required all "designers" and "staffers" to adhere to the following selection criteria: (1) performance; (2) skill level and breadth of skills; and (3) "skills for the future," described as the correlation between skill level and breadth and necessary for the company to achieve objectives.

A critical source of information for these decisions was Ford's 25-panel performance ranking system, and the company's compensation planning tool known as future contribution assessment or "FCA." Plaintiffs allege that this forced ranking technique is biased against older employees and in favor of younger employees. Am. Compl., ¶¶78-90, ECF No. 5, PageID.71-73.

## STANDARD OF REVIEW

A party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Rule 26 [including the proportionality standard] is to be liberally construed to permit broad discovery." *Durand v. Hanover Ins. Grp., Inc.*, 2016 WL 9458551 at *2 (W.D. Ky. 2016). If a court grants a motion to compel, or if discovery is received after a motion is filed, then the court must award reasonable expenses and attorney's fees, unless the successful party did not confer in good faith

---

design but had a disproportionate impact on employees based on age or pension status, then full demographic statistics are also relevant for Plaintiffs' disparate impact claim.

before the motion, the opposing party's position was substantially justified, or other circumstances would make an award unjust. Fed. R. Civ. P. 37(a)(5)(A); see also *Siser North America, Inc. v. Herika G., Inc.*, 325 F.R.D. 200 (E.D Mich. 2018)(quoting Fed. R. Civ. P. 37(d)(3)).

## ARGUMENT

## I. Discovery of aggregate statistical data is the norm in employment discrimination cases.

"It has frequently been stated in employment discrimination cases that 'statistics often tell much and Courts listen.'" PROBATIVE VALUE OF STATISTICAL PROOF, SA92 ALI-ABA 505, 54 (quoting *State of Alabama v. United States*, 304 F.2d 583, 586 (5th Cir.), aff'd, 371 U.S. 37 (1962)). "[A]ggregation of data is the norm, not the exception. *Id.*

Defendants such as Ford Motor Company "are mindful of the statistical implications of small sample size. Thus, they often seek to divide data…into small units such as a year for the purpose of eliminating the opportunity for the plaintiff to prove statistical significance." *Id*. "These defense tactics are well-known to the courts." *Id*. The Sixth Circuit, for example, has expressly addressed the situation where, as here, the employer seeks to slice-and-dice statistical data into "decisional units." As the Sixth Circuit held, "it is certainly possible that an employer will want to fiddle with the definition [of decisional unit] to mask the possible evidence for age discrimination." *Raczak v. Ameritech Corp.*, 103 F.3d 1257, 1263 (6th Cir.

9

1997). "Thus…if the company had actually decided to fire all the old tax lawyers, but not to touch other lawyers, or to be non-discriminatory in its treatment of all other lawyers, it would be in its interest to use a wider category such as all lawyers, to disguise the smaller sub-unit of discrimination." *Id*. Finally, Ford may assert that its own decisional unit data does not yield statistically significant results and does not encompass all employees comparable to plaintiffs for termination decisions under Smart Redesign. *Id*. (citing *Black v. City of Akron*, 831 F.2d 131 (6th Cir.1987)) ("[U]sing very small sub-units could also mask discrimination because it is much more difficult to show or perceive discrimination when only very small numbers are involved."). Aggregated data removes these flaws from the analysis.

Similarly, in *Capaci v. Katz & Besthoff, Inc*., the Fifth Circuit "analyzed the ploy of defendants to disaggregate data and…condemned the practice in strong terms." *Id*. (citing *Capaci*, 711 F.2d 647, 654-56, 32 FEP 961 (5th Cir.1983)). The Fifth Circuit rejected the defendant's "divide and conquer" technique of breaking the data into smaller units because it "was an unfair and obvious attempt to disaggregate that data to the point where it was difficult to demonstrate statistical significance." *Id*. "By fragmenting the data into small sample groups, the statistical tests became less probative." *Id*. (citing *Wheeler v. City of Columbus, Mississippi*, 686 F.2d 1144, 1151 (5th Cir.1982). The Court concluded that "[a]ggregating the data as the plaintiff did was a much more reasonable approach, since liability under

10

Title VII depends on whether the EEOC demonstrated a 'systemwide pattern or practice' of disparate treatment, rather than "the occurrence of isolated or 'accidental' or sporadic discriminatory acts.'" *Id*.

In *Lilly v. Harrison-Teeter Supermarket*, the Fourth Circuit approved of the aggregation of discharge data for four years and explained that aggregation of data is "highly preferable" because "[c]ombined data is more likely to demonstrate the 'pattern or practice' of defendant's policies, whether discriminatory or not." *Lilly v. Harrison-Teeter Supermarket*, 720 F.2d 326 n. 17, 33 FEP 195 (4th Cir.1983). "Moreover, by increasing the absolute numbers in the data, chance will more readily be excluded as a cause of any disparities found. For example, if a coin were tossed ten times in the first day and came up heads four times, no one would think the coin was biased (0.632 standard deviations), but if this same ratio occurred for a total of 10,000 tosses, of which 4,000 were heads, the result could not be attributed to chance (20 standard deviations)." *Id*.

Finally, in *Cook v. Boorstin*, 763 F.2d 1462, 37 FEP 1777 (D.C.Cir.1985), the Court of Appeals for the D.C. Circuit rejected the employer's argument that the plaintiff should be limited to relying upon statistics only for the job classification held or sought by the plaintiff, as opposed to aggregated statistics across different positions. The Court held that [d]isallowing such evidence at the threshold would not only be silly, it would be pernicious[.]" *Cook*, 763 F.2d at 1468–69. Adopting a

narrow approach to statistical proofs "could well preclude the effective use of statistics in combatting race discrimination in many if not most areas of high-level employment. If white collar employees…are limited to statistics involving their particular job classification, generating a large enough numerical base from which to draw statistically significant conclusions is likely in case after case to prove impossible or prohibitively onerous." *Id.* (citations omitted). "The result would be antithetical to the broad remedial goals set by Congress in establishing this country's strong policy against discrimination in the workplace." *Id.*

Aggregate data is more probative in cases where separating data into smaller units would obscure an overall pattern in termination rates. *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 522 (N.D. Cal. 2012). Aggregation is "particularly appropriate where small sample size may distort the statistical analysis and may render any findings not statistically probative." *Ellis*, 285 F.R.D. at 522–23 (quoting *Paige v. California*, 291 F.3d 1141, 1148 (9th Cir.2002)). In other words, "pooling data is sometimes warranted where small sample sizes can tend to obscure disparities[.]" *Id.* (citing *Coates v. Johnson & Johnson*, 756 F.2d 524, 541–42 (7th Cir.1985)). In sum, "larger aggregate numbers allow for a robust analysis and yield more reliable and more meaningful statistical results[.]" *Id.*

Here, like *Ellis*, Ford's SRD and SIRP policies and practices are "uniform across the company." *Id.* Ford's executives and Board of Directors "are informed of

and involved in…the selection process from the top levels of the company." *Id*. Ford's Smart Redesign and SIRP program mandated "company-wide substantive criteria and procedural ground rules guided and supervised by a relatively small and coherent group of company executives." See *Ellis*, 285 F.R.D. at 530.

This is not a case "where guidance from the company on pay and promotion decisions was lacking, and store managers were left to the exercise of their discretion, resulting in hundreds of thousands of store managers across the country making individual decisions that were allegedly discriminatory but not held together by any common content or common mode of decisionmaking."*Carter v. Michigan State Police*, No. 349368, 2020 WL 4036516, at *7 (Mich. Ct. App. July 16, 2020)(distinguishing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). Instead, this is a case where (1) Ford required all designers and staffers to utilize a common mode and common rules for decision-making; and (2) a small group of Ford executives guided and supervised the execution of the decisions across the entire company. Smart Redesign was a company-wide reduction-in-force program that required all organizational designers and staffers to use a common mode and common rules for deciding which employees to select for separation. The Court should order Ford to produce aggregate, company-wide statistical data for the entire program.

II.   **Statistical evidence is unquestionably relevant and proportional in this discrimination case where Ford terminated Plaintiffs' employment as part of a reduction-in-force based on centralized and company-wide guidelines and policies.**

In age discrimination cases where "a plaintiff demonstrates a significant statistical disparity in the discharge rate, he or she has provided strong evidence that chance alone is not the cause of the discharge pattern." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1469. (6th Cir. 1990).

Furthermore, at the pretext stage, if the Defendant implemented a *bona fide* reduction-in-force, then "the plaintiff must introduce additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Arthur v. American Showa, Inc*., No. 14-4145, 625 F. App'x 704, 707 (6th Cir. Aug. 14, 2015) (internal quotation marks and citations omitted); *see also Barnes*, 896 F.2d at 1465.

Demographic data discovery is also essential to the disparate impact theory of discrimination. See *Smith v. City of Jackson, Miss.,* 544 U.S. 228, 239 (2005), and

To prepare their case and obtain discovery to rebut Ford's reduction-in-force defense, Plaintiffs requested information regarding employees who were eligible but not selected for termination. Without this information, Plaintiffs will have no discovery to demonstrate they were replaced by "a younger individual." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). Plaintiffs would also be prejudiced in preparing to rebut Defendant's RIF defense with "additional, direct,

circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons[,]" *Barnes*, 896 F.2d at 1465.

In response to Plaintiffs' request for company-wide data, Ford agreed to produce data limited to the "decisional units" from which it selected Plaintiffs for separation in the RIF. This data is strongly probative of discrimination, but the data pool comprised of Plaintiffs' decisional units is relatively small, and even Defendant's expert report (Ex. 4) demonstrates why a complete data set is necessary to resolve the disputed statistical issues in this case.

**III.   The available statistical evidence, derived only from the "decisional units" from which Ford selected Plaintiffs for termination, demonstrates statistically significant discrepancies, of more than two standard deviations, based on age and proximity to pension milestones.**

**A.   Standard deviation test.**

Courts apply the standard deviation test to determine whether discrepancies in the treatment of older workers are statistically significant. *Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 308-309 & n. 14 (1977). In general, a variance of more than two standard deviations from the expected outcome creates an inference that the difference was not the product of chance alone and that the difference was because of age. *Id.* (quoting *Castaneda v. Partida*, 430 U.S. 482, 496-497, n. 17 ("As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations,' the hypothesis

that teachers were hired without regard to race would be suspect."); see also *Barnes*, 896 F.2d at 1466.

**B.** **The limited decisional unit data provided by Ford reveals a statistically significant disparity, greater than two standard deviations, based on age and proximity to pension milestones.**

In this case, Plaintiffs' statistical expert, Dr. David Macpherson, analyzed the decisional unit data provided by Ford and concluded that there were statistically significant disparities proving discrimination based on age (50 and older) and proximity to pension milestones (ie, against employees within four years of reaching a pension milestone).

**Discrimination based on proximity to pension milestones.** According to the data provided by Ford, there were 345 employees in the same decisional units as Plaintiffs. The predicted number of employees close to (ie, within 4 years of) pension milestones who would be terminated is 14.57. But the number of actual terminations of employees close to pension milestones is 22, meaning "there were 7.43 more terminations of close to pension benefit workers than we would have expected based on the representation of close to pension employees in these pools." Ex.3 – Macpherson report, p. 6. This "difference is statistically significant since, at 2.54 standard deviations, it is greater than…two standard deviations…" *Id*. "Differences of this magnitude are not likely to occur by chance alone. The odds of this difference being due to chance alone are 1 in 88." *Id*. "Therefore, the analysis supports the

allegation of disproportionate termination of close to pension benefit workers in these decisional units." *Id*.

**Age discrimination.** Within the Plaintiffs' decisional units, the representation of older workers (age fifty and older) yields an expected number of 22.24 termination of older workers out of 345 total employees in the pool. The number of actual terminations of older workers was 30 out of 354, for a difference of 7.76 between the predicted and observed terminations. Ex. 1 – Macpherson report, p. 7. This "difference is statistically significant since, at 2.44 standard deviations, it is greater than…two standard deviations…" *Id*. "Differences of this magnitude are not likely to occur by chance alone. The odds of this difference being due to chance alone are 1 in 68." *Id*. at 7-8. "Therefore, the analysis supports the allegation of disproportionate termination of older workers in these decisional units." *Id*. at 8.

**C.     Even though the available data is probative of age discrimination and interference with pension benefits, the Court should order Ford to produce aggregate company-wide data to ensure meaningful statistical analysis.**

While statistical disparities like those presented here provide "strong evidence" of discrimination, *Barnes*, 896 F.2d at 1469, it is also true that "[i]ncomplete or inapplicable analyses, simplistic percentage comparisons, and small sample sizes produce statistical analyses with little probative value." *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 485 (6th Cir.2008)(citations omitted). In this case, Ford has limited the production of data to

the decisional units from which it selected Plaintiffs for separation. And while the sample size of 345 is not too small to provide statistically significant results, there are at least two distinct problems with this limited production.

**D.      Ford's limited data production impedes more meaningful statistical analysis.**

By limiting the data set to a smaller pool of employees, Ford has impeded Plaintiffs from completing a more meaningful statistical evaluation. There is "a potential problem with [statistical] evidence if the scope of discovery is narrow." *Barr v. Smith & Wollensky Rest. Grp., Inc.*, 238 F.R.D. 222, 224 (S.D. Ohio 2006)(citing *James v. Stockham Valves and Fittings Co.*, 559 F.2d 310 (5th Cir.1977)). "A plaintiff's statistical evidence in an employment case is usually subject to criticism if the number of instances evaluated is too small to permit statistically significant conclusions to be drawn." *Id*. (citing *Capaci v. Katz & Besthoff*, 711 F.2d 647, 653-54 (5th Cir.1983)). "It is also subject to criticism if various factors relating to employment decisions, and particularly factors which might legitimately explain discrepancies between the number of the under-represented class members in the pool of employees as compared to the total number of applicants, are not adequately taken into account." *Id*. (citing *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302 (7th Cir.1988). The Court "should permit discovery broad enough to permit a meaningful statistical evaluation to be made." *Id*.

Here, there is "credible evidence of some larger policy in place, SRD/SIRP, "which may have had an impact on local [design and staffing] decisions." *Barr*, 238 F.R.D. 223. The company-wide scope of the program calls for company-wide discovery which is, by definition, proportional to the nature of the case. *Goree v. United Parcel Serv., Inc*., 2015 WL 11120732, at *3 (W.D. Tenn. 2015)(Holding that "if the facts call for it, discovery should be permitted for an entire region where the plaintiff and potential comparators shared a high-level manager who made employment decisions affecting each of them."). Similarly, in *Louzon v. Ford Motor Co.*, 718 F.3d 556, 563 (6th Cir.2013), the Court held that whether a comparator was working for the same supervisor as the plaintiff "should not be given significant weight" because the employee-to-supervisor ratio was so low that "the pool of potential comparators for [the plaintiff] would amount to no more than a few individuals." *Id*. at 564. The court found that limiting the pool of potential comparators to such a small group "would render any plaintiff's burden virtually impossible, even at the prima facie stage." *Id*.; see also *Seay v. TVA*, 339 F.3d 454, 479–80 (6th Cir.2003) (stating that "the 'same supervisor' criterium [sic] has never been read as an inflexible requirement" and is "particularly problematic ... where a violation ... does not occur frequently enough to invite such a direct comparison within a compartmentalized organization") (citing *Ercegovich*, 154 F.3d at 353); see also *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1327 (11th Cir.

2011)("Differences in job ranks…are not, in and of themselves, dispositive as to whether the two individuals may be compared…but they can matter…because the relevant inquiry is whether the employer subjected differently ranked employees to the same or different employment policies.").

Plaintiffs acknowledge that the Court has dismissed the class allegations based on numerosity. For the reasons above, however, this finding has no bearing on the need for full statistical discovery. Furthermore, Ford implemented the 2019 RIF under a uniform program (Smart Redesign/SIRP), and therefore company-wide data is necessary even if this is a group action and not a class action. Ford's Board of Directors issued directives to management to use the program to ensure that it favored younger employees. Ex. 1.

In *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 766-767 (3rd Cir. 1989), the court held evidence of systemic disparate treatment is relevant to pretext even in single plaintiff disparate treatment ADEA cases. Similarly, in *Pace v. Southern Ry. System*, 701 F.2d 1383, 1388 (11th Cir. 1983), the Court held that "evidence of a pattern of terminating older workers … allow[s] the reasonable inference that age had played a role in [the plaintiff's] discharge." *See also, McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 754 (5th Cir. 1980); *Hodgson v. First Federal Savings & Loan Association*, 455 F.2d 818 (5th Cir. 1972). And in *Becker v. ARCO Chemical Co*., 207 F.3d 176, 194 n.8 (3rd Cir. 2000), the Third Circuit held that "evidence of a

defendant's prior discriminatory treatment of a plaintiff or other employees is relevant and admissible…to establish whether a defendant's employment action against an employee was motivated by invidious discrimination."

In this case, the available statistical evidence proves that discrimination occurred along lines of age and pension eligibility. Those factors, and the underlying motives to target employees based on age and pension status, transcend any differences in departments, supervisors, and hierarchical rankings. Smart Redesign was implemented company-wide, and Ford must disclose company-wide data. As Dr. Macpherson concluded in his report:

> These findings of the disproportionate termination of older workers [and close to pension workers] may or may not reflect the broader group of older LL5/LL6 managers. It would be necessary to have data from the remaining decisional units across the company to make a conclusion about all older LL5/LL6 managers [and] using data from other decisional units across the company would increase the statistical power of the analysis or the ability to find an effect if it exists. Ex. 3 – Macpherson report, p. 8.

The Court should order Ford to produce company-wide data to ensure there is a sufficient set of data for purposes of meaningful statistical analysis.

**E.     Data from Plaintiffs' decisional units impedes the "search for truth" and precludes Plaintiffs from determining the full extent to which the centralized RIF program was biased against older employees and employees who were close to pension milestones.**

Ford has limited its production to "Decisional Unit data." Decisional units are merely a subset of, and are much smaller than, the related work groups (RWGs) Ford

used to evaluate employee performance annually. Decisional unit data does not capture the complete picture of whether the separation discriminated based on age and pension status. Thus, decisional unit data is not adequate to determine whether there is statistical evidence of Ford's motive and pretext, and the Court should not sanction Ford's slice-and-dice approach to data production. See *Raczak, supra*. Smart Redesign and SIRP were standard company-wide processes. Ford cannot terminate Plaintiffs pursuant to a large-scale reduction-in-force, rely on these company-wide programs as a defense and, at the same time, withhold discovery about the practices and their statistical impact by carving the pool of affected employees into smaller decisional units. Ford must therefore produce discovery regarding the impact of its company-wide programs.

If Ford can disaggregate the data and limit discovery to decisional units and withhold data beyond them, then discovery will not provide an accurate picture of whether Plaintiffs were treated differently from similarly situated employees. Smart Redesign was centralized – all designers and staffers were required to follow common criteria. It also included reorganizing business units and staffing those units with employees or new hires from within or outside of the decisional unit itself. Decisional unit data would not capture the "before and after" of the groups from which Ford selected Plaintiffs for termination. Full company-wide discovery is

necessary to "increase the statistical power of the analysis or the ability to find an effect if it exists." Ex. 3 – Macpherson report, p. 8.

**F.    The report submitted by Ford's Expert, Dr. Michael Ward, establishes that full disclosure of aggregate company-wide data is essential to the statistical analysis of SIRP terminations and opens the door to production of full and complete data.**

On May 13, 2021, Ford produced the report of its statistical expert, Dr. Michael Ward. Exhibit 4 – Ward report. Dr. Ward's report reveals the need for a robust, company-wide data set in the following ways: (1) complete data would allow to the parties to determine whether or not the discriminatory effects seen in the eight plaintiff's decisional units reflect the broader group of older LL5/LL6 managers; (2) complete data would allow the parties to address Dr. Ward's criticism that Dr. Macpherson's report is biased because it includes the plaintiffs instead of a random sample of decisional units reflecting employees who are not alleging discrimination based on age or proximity to pension milestones; (3) complete data, including performance rating information, would allow us to address Dr. Ward's criticism that my analysis does not account for performance, and whether or not the performance ratings themselves are discriminatory, as alleged by the plaintiffs; and (4) by increasing the sample size, a complete set of data would enhance the statistical power of the analysis. Ex. 5, Macpherson Declaration, ¶8. Thus, according to both parties' experts, there is no dispute that company-wide data is essential to a statistical analysis of the SIRP terminations.

## V – CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Plaintiffs request that the Court:

 1.      Order Ford to produce company-wide data as set forth above; and

2.      Order Ford to pay Plaintiffs' reasonable costs and attorney fees as a sanction pursuant to Rule 37.

Respectfully submitted,

PITT, MCGEHEE, PALMER,
BONANNI AND RIVERS PC

*/s/ Kevin M. Carlson*
Kevin M. Carlson (P67704)
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Attorneys for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800 (phone)
mpitt@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com

Date: July 6, 2021

**CONCURRENCE**

I certify that I have attempted personal contact via e-mail with defense counsel requesting concurrence in the relief sought in this motion.   Defendant does not concur in the relief sought in the motion.

Respectfully submitted,

PITT MCGEHEE PALMER
BONANNI &RIVERS, P.C.


*/s/ Kevin M. Carlson* (P67704)
Kevin M. Carlson (P67704)
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Attorneys for Plaintiff
117 W. Fourth Street, Ste. 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com

Date:  July 6, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2021 I electronically filed the foregoing instrument with the Clerk of the Court using the ECF system which will send notification of such filing to all parties via same.

Signature:__*s/ Carrie Bechill*_____

117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
cbechill@pittlawpc.com

26