# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MONICA NICOLAYSEN DOWHAN, ERIK ELIASON, ANDREW KRESS, MATHEWS V. JOHN, REMO MORRONE, SUSAN QUICK, SUZANNE TWOMLEY,** and **CHING PEI**,

Plaintiffs,

vs.

**FORD MOTOR COMPANY,**

Defendant.

Civil Action No. 2:19-cv-11923
Hon. Bernard A. Friedman
Mag. Judge Anthony P. Patti

_____

**Defendant's Response in Opposition to Plaintiffs' Motion to Compel Responses to First Interrogatories and Requests for Production of Documents and Request for an Award of Attorney Fees and Expenses**

## ISSUES PRESENTED

1.  "Under Fed. R. Civ. P. 37[], a motion to compel may only be made if the non-moving party failed to answer or respond to a proper discovery request under the Federal rules." *Moonbeam Cap. Invs., LLC v. Integrated Constr. Sols., Inc.*, 2019 WL 952711, at *2 (E.D. Mich. Feb. 27, 2019), *objections overruled*, 2019 WL 11720198 (E.D. Mich. June 26, 2019).  Accordingly, this Court's Local Rules expressly instruct that "[a]ny discovery motion . . . *shall* include, in the motion itself or in an attached memorandum, a verbatim recitation of each interrogatory, request, answer, response, and objection which is the subject of the motion or a copy of the actual discovery document which is the subject of the motion." E.D. Mich. L.R. 37.2 (emphasis added).  Plaintiffs move to compel information never before requested in discovery, and fail to cite (or attach) the discovery request on which their motion is based.  The question presented is whether their motion is therefore procedurally improper and should be denied on that basis alone.

2.  Plaintiffs have demanded—roughly sixty days before the close of discovery—a significant volume of information never before requested in the discovery process.  In addition, Plaintiffs' data request comes months after the parties expended substantial resources engaging experts and exchanging expert reports based on the extensive decisional unit data Ford produced nearly a year ago.  The question presented is whether Plaintiffs' motion should be denied on the basis that it is untimely and highly prejudicial to Ford at this late stage of the case.

3.  Federal Rule of Civil Procedure 26(b) only permits discovery of information that is "relevant to any party's claim or defense."  Consistent with that rule, in individual employment cases like this one, "a plaintiff's discovery is normally limited to the employer's conduct toward similarly situated employees who were supervised by the same supervisors alleged to have engaged in the unlawful discriminatory conduct." *Averett v. Honda of Am. Mfg., Inc.*, 2009 WL 799638, at *2 (S.D. Ohio Mar. 24, 2009).  Ford has already produced information regarding the 345 employees against whom Plaintiffs were evaluated when Ford managers made separation decisions, but Plaintiffs now seek "company-wide" employee data regarding thousands of additional employees against whom they were not compared.  The question presented is whether Plaintiffs' motion should be denied because they seek employee information that is not relevant to their individual claims.

4.  The Federal Rules of Civil Procedure instruct courts to limit discovery where its "burden or expense . . . outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *Surles ex rel. Johnson v. Greyhound Lines, Inc.,* 474 F.3d 288, 305 (6th Cir. 2007). Plaintiffs seek to compel production of voluminous "company-wide" employee data relating to thousands of employees, arguably world-wide. Ford will be required to collect that information from multiple, disparate sources, and much of it must be reconstructed as of Plaintiffs' terminations in 2019. The question presented is whether Plaintiffs' motion should be denied because their request is unduly burdensome and disproportionate to the needs of this case.

## CONTROLLING AUTHORITY

*Averett v. Honda of Am. Mfg., Inc.*, 2009 WL 799638 (S.D. Ohio Mar. 24, 2009)

*Mims v. Elec. Data Sys. Corp. (EDS)*, 975 F. Supp. 1010 (E.D. Mich. 1997)

*Moonbeam Cap. Invs., LLC v. Integrated Constr. Sols., Inc.*, 2019 WL 952711 (E.D. Mich. Feb. 27, 2019), *objections overruled*, 2019 WL 11720198 (E.D. Mich. June 26, 2019)

*Scales v. J.C. Bradford & Co.*, 925 F.2d 901 (6th Cir. 1991)

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288 (6th Cir. 2007)

# TABLE OF CONTENTS

I. Introduction.................................................................................1

II. Background ...............................................................................2

III. Legal Standard ........................................................................7

IV. Argument .................................................................................8

    A.    Plaintiffs' Motion Impermissibly Seeks to Compel Significant Information Never Requested in Discovery.........................................8

    B.    Plaintiffs' Motion is Untimely and Prejudicial. ................................11

    C.    The Information Plaintiffs Seek to Compel is Irrelevant to Their Individual Claims. .............................................................13

    D.    Plaintiffs' Demand is Unduly Burdensome and Disproportionate to the Needs of the Case. ....................................................22

    E.    The Court Should Require Plaintiffs to Pay Ford's Attorney's Fees and Expenses Incurred in Opposing Plaintiffs' Motion. ...........24

V. Conclusion.................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Almond v. ABB Indus. Sys., Inc.*,
2001 WL 242548 (S.D. Ohio Mar. 6, 2001) ...................................................... 17

*Averett v. Honda of Am. Mfg., Inc.*,
2009 WL 799638 (S.D. Ohio Mar. 24, 2009) .................................................... 13

*Barnes v. GenCorp Inc.*,
896 F.2d 1457 (6th Cir. 1990) ............................................................................ 19

*Barr v. Smith & Wollensky Rest. Grp., Inc.*,
238 F.R.D. 222 (S.D. Ohio 2006) ....................................................................... 18

*Bobo v. United Parcel Serv., Inc.*,
665 F.3d 741 (6th Cir. 2012) .............................................................................. 23

*Capaci v. Katz & Besthoff, Inc.*,
711 F.2d 647 (5th Cir. 1983) .............................................................................. 18

*Cook v. Boorstin*,
763 F.2d 1462 (D.C. Cir. 1985) .......................................................................... 18

*Croskey v. BMW of N. Am., Inc.*,
2005 WL 8154365 (E.D. Mich. Mar. 1, 2005) ................................................... 12

*Davis-Hussung v. Lewis*,
2015 WL 5546995 (E.D. Mich. Aug. 31, 2015) ................................................... 9

*Dearborn Tree Serv., Inc. v. Gray's Outdoorservices*, *LLC*,
2014 WL 6886407 (E.D. Mich. Dec. 4, 2014) ................................................... 10

*Ellis v. Costco Wholesale Corp.*,
285 F.R.D. 492 (N.D. Cal. 2012) ........................................................................ 19

*Furay v. Lvnv Funding*, *LLC*,
2013 WL 12123867 (S.D. Ohio Aug. 5, 2013) .................................................... 9

*Garrison v. Dutcher*,
2008 WL 938159 (W.D. Mich. Apr. 7, 2008) ...................................................... 9

*Geiger v. Pfizer, Inc.*,
2008 WL 2388112 (S.D. Ohio 2008) ................................................................. 14

# TABLE OF AUTHORITIES

Page(s)

*Goree v. United Parcel Serv., Inc.*,
   2015 WL 11120732 (W.D. Tenn. Oct. 5, 2015)...................................................18

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*,
   474 F.3d 288 (6th Cir. 2007) ...........................................................................8, 22

*Martin v. Select Portfolio Serving Holding Corp.*,
   2006 U.S. Dist. LEXIS 68779 (S.D. Ohio Sept. 25, 2006) ..................................8

*Mims v. Elec. Data Sys. Corp. (EDS)*,
   975 F. Supp. 1010 (E.D. Mich. 1997) ...........................................................13, 17

*Moonbeam Cap. Invs., LLC v. Integrated Constr. Sols., Inc.*,
   2019 WL 952711 (E.D. Mich. Feb. 27, 2019).......................................................9

*Parrottino v. Bankers Life & Cas. Co.*,
   2014 WL 1516195 (E.D. Mich. Apr. 17, 2014) ..................................................24

*Raczak v. Ameritech Corp.*,
   103 F.3d 1257 (6th Cir. 1997) ...........................................................................14

*Scales v. J.C. Bradford & Co.*,
   925 F.2d 901 (6th Cir. 1991) ..................................................................13, 14, 15

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)............................................................................................17

*Welding Fume Prods. Liab. Litig.*,
   2006 WL 1173960 (N.D. Ohio Apr. 5, 2006) ....................................................23

**Rules**

E.D. Mich. L.R. 37.2.............................................................................................9

Fed. R. Civ. P. 26....................................................................................7, 18, 22

Fed. R. Civ. P. 37.............................................................................................9, 25

**Regulations**

29 C.F.R. § 1625.22 ...........................................................................................14

## I. Introduction

In the two years since the eight individual Plaintiffs in this action filed their Complaint challenging their separations from Ford, Ford has produced close to 50,000 pages of documents and provided Plaintiffs with extensive data about the 345 employees against whom they were evaluated for separation.  Both parties prepared expert reports using this data months ago.  Discovery in this matter now closes in less than sixty days.  Yet, apparently having recognized the inadequacy of their expert's analysis and the dearth of other evidence supporting their claims, Plaintiffs seek an eleventh-hour do-over—moving to compel production of sweeping and irrelevant data about *nearly three thousand* Ford employees, if not more, across myriad unrelated business units and with no connection to the decisions that impacted Plaintiffs.

The Court should deny this request out of hand.  To start, Plaintiffs' motion is procedurally improper.  Plaintiffs fail to identify (and indeed *never* made) any discovery request seeking the information they now demand.  This flaw alone is fatal to their motion.  And, at this late date, the motion is also untimely and severely prejudicial to Ford.  If granted, Plaintiffs' sweeping demand for data would derail the current schedule in this case while imposing an immense burden on Ford, forcing it to scour numerous sources of information to collect, compile, and review the data Plaintiffs demand.  And such a burdensome exercise is unnecessary—the

information Plaintiffs request is irrelevant. Ford long ago produced all the data necessary to evaluate Plaintiffs' individual claims. The Court should deny Plaintiffs' motion and award Ford its reasonable costs and attorney's fees spent opposing it.

## II. Background

The automotive industry is undergoing transformational change, with new technologies, new competitors, and changing customer needs. To meet these new challenges and opportunities, Ford undertook a comprehensive redesign of its salaried workforce to streamline its organizational structure and focus its employees' efforts on the company's most critical work. This "Smart Redesign" implicated all areas of Ford's business. Accordingly, the program was designed to take into account the unique needs of Ford's various organizations—engineering, finance, marketing, design, production, etc.—each of which necessarily differed substantially with respect to the skill set and structure required going forward.

While Smart Redesign was an important step forward for Ford, unfortunately it also meant that Ford had to let some employees go. Hundreds of Ford business leaders were tasked with restructuring their business units and the job positions within them according the individual needs of their respective organizations. They then made staffing and separation determinations for their reorganized teams—a discretionary process which, for mid- to lower-level managers (referred to as LL3 –

LL6s),[1] was guided by a performance- and skill-based involuntary group separation program called the "Salaried Involuntary Reduction Process" ("SIRP").[2]

Smart Redesign proceeded in four, successive "Waves," as well as an "Extended Wave" that addressed unique central business units like the HR department.  Each Wave focused on a different segment of Ford's management team,[3] with an overarching goal of "flattening" the organization—*i.e.*, reducing unnecessary hierarchies and reporting lines to improve overall efficiency. Employees under consideration for separation within each Wave were grouped into distinct "decisional units," which correlated to their roles within the larger business, their reporting lines, and their salary grades.

Each Wave had a "design phase" and a "staffing phase."  Both phases were overseen and executed by hundreds of separate "designers"—more senior leaders in each impacted area who were tasked with the redesign of their respective organizations.  In the design phase, the designers restructured their individual organizations and determined what work should be prioritized, streamlined, moved

---

[1]  "LL" refers to "leadership level," of which there are six (LL1 being the most senior leadership level).

[2]  In recognition of their service, Ford offered affected employees, including Plaintiffs, generous severance packages in exchange for a release agreement. Almost all separated individuals accepted these attractive severance packages.  The eight Plaintiffs, along with a small handful of other individuals, chose not to do so.

[3]  Wave 1, for example, focused on the LL3 employees.  Wave 2 moved to LL4 employees, and so on.

(either to another business unit or abroad), or stopped altogether—determinations that necessarily differed significantly across business units. As such, designers were afforded a high degree of flexibility to restructure their organizations according to their specific business needs.

In the staffing phase, designers determined which employees in their particular decisional units would occupy the new roles in their restructured organizations. Staffing decisions were guided—at a very high level—by three, broad performance- and/or skill-based criteria (the "SIRP criteria"): (1) the employee's overall performance, evaluated in relation to others in the relevant decisional unit; (2) the employee's "breadth of skills," evaluated according to the specific needs of the reorganized business group; and (3) the employee's "skills for the future," evaluated according to the skill sets required in the restructured organization. *See* Ex. A at 14–16.[4] Given the wide variability in business needs across organizations, the SIRP criteria were structured to preserve designers' discretion to make staffing decisions based on their organizations' specific goals. The ultimate separation decisions were made at the decisional unit level by

---

[4] Pursuant to Local Rule 5.3, and in an effort to avoid an unnecessary sealing motion, Ford is filing a redacted copy of Exhibit A, which excises those portions deemed confidential and not relevant to the matter before the Court. Ford will file an unredacted copy of the Exhibit under seal at the Court's request.

individual designers closest to the needs of the restructured organizations and best positioned to assess which employees to let go.

The eight individual Plaintiffs are former LL5 and LL6 employees from various Ford business organizations. All of them—with the exception of Sue Quick, who was part of the Extended Wave—were separated in Wave 4 of Smart Redesign. Plaintiffs were evaluated for separation by eight different designers and alongside other employees in eight distinct decisional units. The bases for Plaintiffs' separations vary. Some were lower performers relative to other employees in their decisional units. Others had their roles changed, combined with other positions, or eliminated entirely. Many lacked the skill sets or breadth of skills required for their restructured organizations going forward.

Plaintiffs filed a putative class action, challenging their terminations and seeking even more generous early-retirement benefits than Ford offered. *See* ECF Nos. 1, 5. Their core allegation is that Ford, with Boston Consulting Group, utilized a "proprietary algorithm" that "was deliberately programmed to target older and higher pension-cost salaried employees." ECF No. 5 ¶ 4. In December 2020, the Court granted Ford's motion to deny class and collective action certification and the case has thereafter proceeded on an individual basis.

The parties have engaged in extensive discovery. In addition to producing close to 50,000 pages of responsive documents from dozens of custodians, Ford

produced to Plaintiffs—following a lengthy meet and confer process—substantial data regarding *all* of the 345 employees in Plaintiffs' respective decisional units, including but not limited to their age, years of credited service, position title, 2018 performance review, and relevant designer.  Ford had to compile this data (sometimes manually) from multiple disparate sources, requiring significant, time-intensive labor to locate, collate, review, and produce.  Ex. C ¶ 6.  Using this data, which was produced last year, the parties engaged experts and exchanged expert reports in early 2021.  *See* ECF Nos. 44-3, 44-4.  The Plaintiffs were recently deposed, and the parties are in the process of scheduling numerous additional depositions—including expert depositions.  Discovery in this matter closes in less than sixty days.

Despite the fact that expert deadlines have long since passed and discovery is in its very final stages, Plaintiffs filed this Motion to Compel, demanding "company-wide data showing all LL5 and LL6 employees selected and not selected for termination" in all "four waves of Smart Redesign/SIRP."  ECF No. 44 at 1.  Plaintiffs now claim—for the very first time—that the decisional unit data Ford produced is "too small to provide statistically significant results."  *Id.* at 18.  Notably, however, Plaintiffs fail to identify any specific discovery request on which their motion is based.

In support of their motion, and out of the roughly 50,000 pages of documents produced in this case, Plaintiffs point to exactly *two* documents for the extraordinary proposition that their separation decisions were infected by systemic, discriminatory bias from Ford's top leadership. *See* ECF Nos. 44-1, 44-2. These isolated documents demonstrate no such thing. *See* Section C, *infra*. After years of extensive discovery, Plaintiffs are unable to identify even a shred of actual evidence supporting their baseless contention that their separation decisions, which were made by *different* decisionmakers from *different* business organizations and for *different* reasons, were themselves discriminatory—much less that discrimination infected the process writ large. Moreover, Plaintiffs conspicuously obscure that their core disparate impact theory, premised on a non-existent "algorithm," has been wholly debunked. They make no mention of this phantom "algorithm" in their motion.

At bottom, Plaintiffs' (procedurally improper) motion is nothing more than a transparent fishing expedition that would force Ford to compile, at the eleventh-hour, data Plaintiffs hope might fit their narrative with a second chance at expert discovery. For the reasons set forth below, Plaintiffs' motion should be denied.

### III. Legal Standard

Federal Rule of Civil Procedure 26(b) only permits discovery of information that is "relevant to any party's claim or defense." "The proponent of a motion to compel discovery bears the initial burden of proving that the information sought is

relevant." *Martin v. Select Portfolio Serving Holding Corp.*, 2006 U.S. Dist. LEXIS 68779, at *2 (S.D. Ohio Sept. 25, 2006).  The Federal Rules further instruct courts to limit discovery where its "burden or expense . . . outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."  *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007).  "Although a plaintiff should not be denied access to information necessary to establish [his] claim, neither may a plaintiff be permitted to 'go fishing' and a trial court retains discretion to determine that a discovery request is too broad and oppressive." *Id*.

### IV. Argument

**A.    Plaintiffs' Motion Impermissibly Seeks to Compel Significant Information Never Requested in Discovery.**

While Plaintiffs nominally style their request as a "Motion to Compel Responses to First Interrogatories and Requests for Production of Documents," Plaintiffs do not identify a *single* Interrogatory or Request for Production upon which their sweeping request is based.  Nor could they.  In the two-plus years since this case was filed, and despite serving multiple (and frequently cumulative) rounds of discovery requests, Plaintiffs have *never* requested "company-wide" data for all LL5 and LL6 employees considered for separation in all "four waves of Smart Redesign/SIRP."  ECF No. 44 at 1.  Their motion thus fails out of the gate.

"Under Fed. R. Civ. P. 37[], a motion to compel may only be made if the non-moving party failed to answer or respond to a proper discovery request under the Federal rules." *Moonbeam Cap. Invs., LLC v. Integrated Constr. Sols., Inc.*, 2019 WL 952711, at *2 (E.D. Mich. Feb. 27, 2019), *objections overruled*, 2019 WL 11720198 (E.D. Mich. June 26, 2019); *Davis-Hussung v. Lewis*, 2015 WL 5546995, at *1 (E.D. Mich. Aug. 31, 2015) (same). Accordingly, this Court's Local Rules expressly instruct that "[a]ny discovery motion . . . *shall* include, in the motion itself or in an attached memorandum, a verbatim recitation of each interrogatory, request, answer, response, and objection which is the subject of the motion or a copy of the actual discovery document which is the subject of the motion." E.D. Mich. L.R. 37.2 (emphasis added). Courts routinely "den[y] motions to compel the production of documents where the movant fail[s] to make a formal discovery request for the documents," *Garrison v. Dutcher*, 2008 WL 938159, at *2 (W.D. Mich. Apr. 7, 2008) (collecting cases), or to "provide[] to the Court a copy of [their] discovery requests or any information regarding [their] interrogatories or document requests," *Furay v. Lvnv Funding*, LLC, 2013 WL 12123867, at *1 (S.D. Ohio Aug. 5, 2013). This Court should do the same.

Plaintiffs have not provided the Court "a copy of the actual discovery document which is the subject of the motion." Nor have they included a "verbatim recitation of each interrogatory, request, answer, response, and objection"—indeed,

Plaintiffs' motion fails to even *cite* a single, specific discovery request. The reason for that conspicuous omission is clear: Plaintiffs' motion demands a staggering volume of information that was not formally (or informally) requested in discovery.

The discovery requests Plaintiffs did issue cannot supply a basis for this motion. Plaintiffs sought, and Ford *produced*, substantial information regarding "all employees who were considered for separation along with each plaintiff." Ex. B at Interrogatory No. 7. Plaintiffs also originally requested Ford provide a "searchable electronic spreadsheet, database, Microsoft Excel, or other similar electronic file" containing certain information regarding "employees at salary grades LL5 and LL6 who were eligible for termination in the *Fourth Wave* of the 2019 SIRP." *Id*. at Request for Production No. 7 (emphasis added). But in addition to being irrelevant, unduly burdensome, and disproportionate to the needs of the case, *see* Sections C, D, *infra*, this request is improper under Rule 34 because it would require Ford to *create* documents that do not already exist. *Dearborn Tree Serv., Inc. v. Gray's Outdoorservices*, *LLC*, 2014 WL 6886407, at *4 (E.D. Mich. Dec. 4, 2014) ("A request to produce cannot ask the responding party to create documents, such as lists; Rule 34 can be used only to require the production of things in existence."). In any event, neither of these requests sought the same information Plaintiffs now demand, including data from the first three Waves of Smart Redesign and granular supervisor information for all relevant employees.

A motion to compel is not an open-ended vehicle for Plaintiffs to cure their own failure to timely request material.  Plaintiffs' motion is procedurally improper on its face, and should be denied for that reason alone.

## B.    Plaintiffs' Motion is Untimely and Prejudicial.

Plaintiffs' eleventh-hour motion is also untimely and prejudicial to Ford. Plaintiffs have demanded—roughly sixty days before the close of discovery—an astounding volume of information never before requested in the discovery process. On top of coming at the very tail-end of a years-long discovery runway, Plaintiffs' data request comes *months after* the parties expended significant resources engaging experts and exchanging expert reports based on the extensive decisional unit data Ford produced nearly a year ago.  *See* ECF Nos. 44-3, 44-4.  Plaintiffs may not like the results of this expert analysis (which disproves their claims), but that is not an excuse for (improperly) seeking new, irrelevant, and significantly burdensome discovery just under-the-wire.

Ford has produced roughly 50,000 pages of responsive documents in this case. The eight Plaintiffs were recently deposed, and the parties need to complete numerous additional depositions—including expert depositions—before the close of discovery on September 16, 2021.  New deposition notices received from Plaintiffs in July contain additional Requests for Production requiring a response.  Despite all of these efforts to complete discovery under the current schedule, Plaintiffs now seek

to compel Ford to devote further, extensive resources to collecting, collating, and compiling a vast amount of disparate and irrelevant material—even though Plaintiffs never bothered to serve a proper discovery request seeking it.

In addition to the outsized burden required for the production of "company-wide" data, *see* Section D, *infra*, Plaintiffs ignore the practical implications of their demand. Additional data is useless absent expert analysis. But the deadlines for expert reports have long-since passed, meaning any justification for this data has passed with them. Plaintiffs have not argued that they should be permitted an additional expert report. Nor could they. Such a request would be out of time and highly prejudicial, as it would necessitate yet another round of resource-intensive expert engagement, reports, and discovery—with less than sixty days remaining in the discovery schedule. *See, e.g.*, *Croskey v. BMW of N. Am., Inc.*, 2005 WL 8154365, at *4 (E.D. Mich. Mar. 1, 2005) (denying plaintiff's motion to compel as untimely, despite an extension of the discovery deadline, in part because plaintiff's request would necessitate additional expert discovery, and noting that "[p]laintiff had all the information he needed to file this motion long ago, but failed to do so"). In short, imposing this type of discovery and unjustified burden would be severely prejudicial to Ford at this late stage of the case.

## C. The Information Plaintiffs Seek to Compel is Irrelevant to Their Individual Claims.

In individual employment cases like this one, "a plaintiff's discovery is normally limited to the employer's conduct toward similarly situated employees who were supervised by the same supervisors alleged to have engaged in the unlawful discriminatory conduct." *Averett v. Honda of Am. Mfg., Inc.*, 2009 WL 799638, at *2 (S.D. Ohio Mar. 24, 2009). That makes perfect sense. In disparate impact cases, statistics "must be probative of an imbalance caused by a specific employment practice *in the particular pool of workers to which the plaintiff belongs*." *Mims v. Elec. Data Sys. Corp. (EDS)*, 975 F. Supp. 1010, 1018 (E.D. Mich. 1997) (emphasis added). Likewise, in disparate treatment cases, "statistical information beyond the relevant employment unit" has "diminished probative value" in the absence of proof of a larger governing "single policy." *Id.*; *see also Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 907 (6th Cir. 1991) (where "employment decisions were made locally, discovery may be properly limited to the employing unit"). Accordingly, "courts frequently limit discovery to comparable employees within the same employment unit or division." *Averett*, 2009 WL 799638, at *2.

The Court should do the same here. Because Plaintiffs seek to demonstrate that the individual decisions to select them for separation were discriminatory, discovery must be limited to information regarding "similarly situated employees" subject to the same decisionmakers. *Averett*, 2009 WL 799638, at *2. That

-13-

information is exactly what Ford has already produced.  Ford has provided Plaintiffs

with data regarding the 345 employees in Plaintiffs' individual decisional units.  *See*

ECF No. 44 at 4, 15, 17–18, 22  (admitting Ford has produced data for the decisional

units "from which Ford selected Plaintiffs for termination").  As the name

"decisional unit" suggests, those units encompassed the groups of employees against

whom Plaintiffs were evaluated when their individual designers made staffing and

separation decisions.  *See* Ex. A at 9 ("The scope of the decisional unit should reflect

WHO are the group of employees being considered in comparison with one another

to be separated . . . ."); 29 C.F.R. § 1625.22(f)(3)(B) (defining "decisional unit"

under the ADEA).

As such, "there is no reason to believe that information about employees in

other [decisional units] will shed light on the motive or intent behind the decisions

that affected [Plaintiffs]."  *Geiger v. Pfizer, Inc.*, 2008 WL 2388112, at *3 (S.D.

Ohio 2008); *see also Scales*, 925 F.2d at 907.  Indeed, while Plaintiffs speculate that

Ford might have drawn the decisional units to "mask the possible evidence of age

discrimination," ECF No. 44 at 9–10 (quoting *Raczak v. Ameritech Corp.*, 103 F.3d

1257, 1263 (6th Cir. 1997)), they offer no support whatsoever of that theory.

Even if limited to U.S.-based LL5 and LL6 employees, Plaintiffs' request is

plainly overbroad.  "Company-wide data" for LL5 and LL6 employees "selected and

not selected" for separation from U.S.-based decisional units just during Wave 4

-14-

would capture information on nearly three thousand Ford employees, the vast majority of whom worked in entirely different business units than Plaintiffs.[5]   In addition, *none* of the Plaintiffs was separated prior to Wave 4 of Smart Redesign. Information about LL5 and LL6 employees who were "selected and not selected" for separation in earlier waves of Smart Redesign—which focused on senior managers above the LL5 level—is thus irrelevant to Plaintiffs' claims.

Plaintiffs argue without support that Ford must nevertheless produce this sweeping company-wide data because "Ford required all designers and staffers to utilize a common mode and common rules for decision-making; and . . . a small group of Ford executives guided and supervised the execution of the decisions across the entire company." ECF No. 44 at 13.  In truth, during Wave 4—which affected thousands of employees—*hundreds* of individual designers were tasked with deciding which employees in their decisional units would be selected for separation. There was no "small group of Ford executives" providing individual input on hundreds of simultaneous separation decisions.  Rather, "employment decisions were made locally" at the decisional unit level by designers best positioned to assess which employees to separate.  *Scales*, 925 F.2d at 907.

---

[5]  While Smart Redesign was a global initiative, the SIRP process and criteria were limited to U.S. salaried employees and designed to comply with U.S. employment laws.  *See* Ex. A at 8.  Information about overseas employees subject to different separation criteria is patently irrelevant to Plaintiffs' challenges to the SIRP process.

The existence of common SIRP separation criteria does not suggest, much less require, the production of company-wide data, since the application of those criteria was highly individualized.  The SIRP's design phase was meant to determine what work was a priority for Ford's future business and what work should be deprioritized, streamlined, moved, or stopped.  Unsurprisingly, the answers to those questions varied widely in different parts of Ford's business, and designers were given flexibility to restructure their organizations and decide which job roles should be retained, changed, or shed altogether.  Thus, even *before* applying the SIRP factors to decide which employees would be retained, designers made localized design decisions that left certain employees more likely to be separated when their positions were eliminated.  The variability inherent in this set of restructuring decisions eliminates the value of any company-wide analysis.

Local flexibility was also a hallmark of the subsequent staffing phase, during which hundreds of individual designers determined which employees would occupy the roles in their redesigned organizations.  The SIRP criteria provided high-level guideposts, but were intentionally structured to allow designers' discretion to make staffing decisions depending on their redesigned organizations' goals and the skills of the employees in their decisional units.  Performance (SIRP criterion 1) was evaluated in relation to "others within the group."  Ex. A at 14.  Likewise, the "breadth of skills" (SIRP criterion 2) needed within each reorganized business group

varied. *See id*. at 14 ("Do not select an employee for separation based on the employee lacking a skill, if that skill is not needed within the group"). And assessments of "skills for the future" (SIRP criterion 3) were necessarily dependent on each organization's unique business needs following Smart Redesign. *See id.* at 15 (future skills needed are based on "the role mandates of the redesigned org").

Thus, the SIRP criteria facilitated designers' individualized staffing decisions based on each business unit's idiosyncratic goals and the relative performance of the employees within each decisional unit. That is not a "common rule[]" of decision-making, ECF No. 44 at 13, but the reverse. *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011) (employer's "'policy' of *allowing discretion* by local supervisors over employment matters" was "just the opposite of a uniform employment practice"). Given that variability, "the decision-making process concerning which employees should be laid off varied from department to department," and company-wide data is not "useful" in assessing Plaintiffs' claims. *Almond v. ABB Indus. Sys., Inc.*, 2001 WL 242548, at *20 (S.D. Ohio Mar. 6, 2001), *aff'd,* 56 F. App'x 672 (6th Cir. 2003). Indeed, such data is *less* probative than decisional unit data involving employees evaluated by the same decisionmakers. *See Mims*, 975 F. Supp. at 1018 (statistics for "employment unit larger than the plaintiff's" were "not probative" where decisionmakers were not "governed by any broader policy"); *Dukes*, 564 U.S. at 356–57 (noting that "disparities at the regional

and national level" did not "establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level").

The decentralized nature of the SIRP decision-making process easily distinguishes this case from those Plaintiffs cite in support of their motion, ECF No. 44 at 12–19, which involved direct participation of managers from different geographic locations in employment decisions or otherwise centralized policies. *See, e.g.*, *Barr v. Smith & Wollensky Rest. Grp., Inc.*, 238 F.R.D. 222, 223 (S.D. Ohio 2006) (permitting discovery beyond single location based on evidence that managers from another site had input into hiring decisions); *Goree v. United Parcel Serv., Inc.*, 2015 WL 11120732, at *3 (W.D. Tenn. Oct. 5, 2015) (*denying* plaintiffs' request for broad region-level discovery and noting that such discovery is only appropriate where plaintiff and comparators shared "high-level manager who made employment decisions affecting each of them").

Plaintiffs' remaining cases are similarly inapposite.  First, many of them are decades old (and out-of-circuit), predating both the amendments made to Federal Rule of Civil Procedure 26 aimed at permitting courts to restrict the breadth of discovery and substantial developments in the case law regarding the appropriate scope of statistical analysis in single-plaintiff disparate impact cases. *See, e.g.*, *Cook v. Boorstin*, 763 F.2d 1462 (D.C. Cir. 1985); *Capaci v. Katz & Besthoff, Inc.*, 711

F.2d 647 (5th Cir. 1983). And a significant portion of Plaintiffs' case law involves class claims, a decidedly different context in which the calculus regarding the appropriate scope of discovery is unique. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012). Other cases *support* Ford's position that statistical data should be limited to Plaintiffs' decisional units. *See, e.g.*, *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1467 (6th Cir. 1990) (rejecting contention that statistical sample limited to Plaintiffs' "Division[s]" was "too small"). Thus, Plaintiffs' hodgepodge of cases lends no support for their position.

Recognizing the individualized nature of the SIRP process, Plaintiffs attempt to gin up an overarching plot by high-level Ford executives to use Smart Redesign to "eliminate older workers in order to make room for younger employees in the organization." ECF No. 44 at 2. Despite the extensive discovery in this case to date, Plaintiffs have no evidence to support this claim. Instead, they offer only two stray emails, neither of which actually supports their theory. The first, a May 8, 2019 email from Chief Human Resources Officer Kiersten Robinson, references identifying and elevating "junior talent" *after* completion of Smart Design. *See* ECF No. 44-1. Plaintiffs seize on this vague language, which makes no reference to age, as evidence of centralized decision-making, ECF No. 44 at 2, while ignoring mountains of evidence that separation decisions were actually made by hundreds of

individual designers based on localized factors—not by some unidentified cadre of high-level Ford executives.

Notably, Robinson sent her email *after* the design and staffing phases of Wave 4 of Smart Redesign in the U.S. had already been completed, fatally undermining any claim that issues in the message played any role in Wave 4 separation decisions. Indeed, one of the email thread participants responded that any "metrics" related to promotions, tenure, and changes in Ford's management structure should not be generated until the completion of Wave 4 in Europe—where the staffing phase was still ongoing—so as not to "steer[] the outcome" there. *Id.* On its face, Robinson's email considered the question of how lower-level employees could take on more responsibility in their redesigned organizations—not criteria for making the already-concluded staffing determinations. This going-forward analysis simply has no relevance to separation decisions made during Smart Redesign.

The second email Plaintiffs cite, sent in 2018 by former Ford employee Graydon Reitz, is also no evidence. In discussing spousal support with his ex-wife, Reitz, who was separated in an earlier Wave of Smart Redesign, baldly claims that Ford was "targeting the most senior leaders first." ECF No. 44-2. But Plaintiffs offer no reason to think that Reitz had any insight into the Smart Redesign process, instead vaguely invoking his undefined position as a "senior Ford executive" as

-20-

supposed proof of the accuracy of his claims.  ECF No. 44 at 3.  Reitz's sour-grapes hearsay offers no actual evidence that Smart Redesign was discriminatory.

Equally meritless is Plaintiffs' claim that their expert, Dr. MacPherson, requires company-wide data to conduct a "more meaningful statistical analysis."  *Id.* at 17–21.  Here, Plaintiffs attempt to have their cake and eat it too, demanding more data while also asserting that their current statistical analysis is sufficient to demonstrate statistical significance.  *See id.* at 5, 17–21.  This incongruity suggests that they are simply dissatisfied with the results of their analysis and seek a do-over.

Unfortunately for Plaintiffs, as Defendants' expert, Dr. Ward explained, the central problems with Dr. Macpherson's analysis are *not* caused by a lack of data.  For example, Plaintiffs cannot dispute that Ford has *already* made performance review data available to them for everyone in Plaintiffs' decisional units.  *See* ECF No. 44-4 at 4 ("Data made available to Dr. Macpherson and to me include performance reviews for each employee.").  But Dr. Macpherson's analysis failed to account for this and other readily available data, and these and other small changes to his approach cause his findings of statistical significance to disappear.  *See generally id.*  As such, Plaintiffs are wrong to suggest that Dr. Ward's analysis justifies producing company-wide data.

At bottom, Plaintiffs' dissatisfaction with the lack of evidence supporting their claims cannot justify a belated fishing expedition seeking voluminous, irrelevant

company-wide employee data where Ford has already provided the relevant information.

**D.     Plaintiffs' Demand is Unduly Burdensome and Disproportionate to the Needs of the Case.**

In addition to seeking irrelevant information, Plaintiffs' request is overbroad, unduly burdensome, and disproportionate to the needs of this case.

"[D]istrict courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Surles*, 474 F.3d at 305.  Here, the discovery Plaintiffs seek is not "proportional to the needs of the case," particularly because "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).

Plaintiffs ask this Court to compel Ford "to produce company-wide data" regarding "*all* LL5 and LL6 employees selected *and not selected*" in all "*four* waves of Smart Redesign/SIRP."  ECF No. 44 at 1 (emphases added).  This request covers highly sensitive information, including "name, date of birth, date of hire, salary grade, job title as of 5/21/19, work group, business unit, [and] most recent (2019) performance review rating," for *thousands* of Ford employees, arguably world-wide. *Id.*  Not stopping there, Plaintiffs also ask that Ford compile, review, and produce data on all direct supervisors for these employees, many of whom were wholly uninvolved with separation decisions—without proffering any reason why such data is necessary.  *See id.*

The Court has already concluded that this is a multi-plaintiff—not class action—case, involving eight discrete separation decisions that occurred during the multi-phase restructuring of Ford's salaried workforce.  Plaintiffs were considered for separation by different designers within the discrete universe of their individual decisional units.  Yet Plaintiffs demand data covering the full breadth of the Ford's salaried workforce, which will undeniably include employees who are not similar to Plaintiffs in *any* relevant way, much less "in *all* relevant respects."  *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (emphasis added).

Ford has already produced data on Plaintiffs' Wave 4 decisional units, which is more than sufficient to allow Plaintiff to identify potentially proper comparators. *See Welding Fume Prods. Liab. Litig.*, 2006 WL 1173960, at *10 (N.D. Ohio Apr. 5, 2006) (denying further discovery where the burden and expense "far outweigh[ed] the likely benefit, especially in light of the limited relevance of the proposed discovery and the extent of the discovery already obtained").  In fact, Plaintiffs admit that "the available data is large enough to complete an analysis" of their individual separation decisions.  ECF No. 44 at 4.  Nothing more is warranted.

As Plaintiffs are aware based on a lengthy meet and confer process about Ford's prior productions of data, there is no way for Ford to quickly or easily produce company-wide data.  The data Ford produced on the 345 individuals in Plaintiffs' decisional units took significant, time-intensive labor by Ford personnel to locate

and collate. Ex. C ¶ 6. Read literally, Plaintiffs' eleventh-hour requests cover *nearly three thousand* individuals, if not more, with no connection whatsoever to this case or the individual separation decisions at issue. *Id*. ¶ 8.

It would be unreasonably time consuming and burdensome for Ford to collect (from multiple, disparate sources), compile, and review all the data demanded. *See Id*. ¶¶ 8–10. Among other things, Ford would be required to collect employees' performance ratings—which are stored separately from other employee data—and match them with the other pieces of information Plaintiffs seek for each employee. *Id.* ¶ 9. Plaintiffs also demand numerous pieces of information (*e.g.*, supervisor, job title, and work group) that have changed for many employees in the more than two years since Smart Redesign ended, necessitating a complex historical reconstruction of that data as of 2019. *Id.* ¶ 10. Forcing Ford to undertake such onerous tasks is unwarranted here. *See Parrottino v. Bankers Life & Cas. Co*., 2014 WL 1516195, at *3 (E.D. Mich. Apr. 17, 2014) (limiting discovery request that would "require Defendant to produce an all-encompassing list that includes hundreds of cases that are irrelevant to Plaintiff's claims"). The Court should deny Plaintiffs' demand as patently unreasonable and plainly disproportionate to the needs of this case.

## E. The Court Should Require Plaintiffs to Pay Ford's Attorney's Fees and Expenses Incurred in Opposing Plaintiffs' Motion.

Should the Court deny Plaintiffs' procedurally improper motion, Ford respectfully requests Plaintiffs be required to pay Ford's reasonable expenses

incurred in opposing this motion, including attorney's fees, pursuant to Federal Rule of Civil Procedure 37(a)(5)(B).

## V. Conclusion

For the reasons set forth above, Ford respectfully requests the Court deny Plaintiffs' Motion to Compel and award Ford reasonable expenses incurred in opposing the motion, including attorney's fees.

Dated: July 20, 2021                          Respectfully submitted,

                                       By: /s/ *Katherine V.A. Smith*

Elizabeth Hardy (P37426)                     Katherine V.A. Smith
Thomas G. Kienbaum (P15945)                  GIBSON, DUNN & CRUTCHER LLP
Thomas J. Davis (P78626)                     333 South Grand Avenue
Julia Turner Baumhart (P49173)               Los Angeles, CA 90071
Eric J. Pelton (P40635)                      (213) 229-7000
William B. Forrest III (P60311)              ksmith@gibsondunn.com
KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.                      Karl G. Nelson
280 N. Old Woodward Ave.,                     GIBSON, DUNN & CRUTCHER LLP
Suite 400                                     2001 Ross Avenue, Suite 2100
Birmingham, MI 48009                          Dallas, TX 75201
(248) 645-0000                                (214) 698-3100
ehardy@khvpf.com                              knelson@gibsondunn.com
tkienbaum@khvpf.com
tdavis@khvpf.com                              Jesenka Mrdjenovic (P82587)
jbaumhart@khvpf.com                           GIBSON, DUNN & CRUTCHER LLP
epelton@khvpf.com                             1050 Connecticut Ave., N.W.
wforrest@khvpf.com                            Washington, D.C. 20036
                                              (202) 887-3660
                                              jmrdjenovic@gibsondunn.com
                                              *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following: brivers@pittlawpc.com, mpitt@pittlawpc.com, mbonanni@pittlawpc.com, and kcarlson@pittlawpc.com, and I hereby certify that I have caused to be served via U.S. mail the foregoing document to the following non-ECF participants:

(no manual recipients)

/s/ *Katherine V.A. Smith*
*Attorney for Defendant*